634 A.2d 116

IN THE MATTER OF THE GUARDIANSHIP OF A.A.M.

Superior Court of New Jersey
Appellate Division

Argued October 5, 1993—Decided December 1, 1993.

Before Judges MICHELS, KESTIN and WEFING.

*Christine M. Leone–Zwillinger,* Deputy Attorney General, argued the cause for appellant New Jersey Division of Youth and Family Services (*Fred DeVesa,* Acting Attorney General, *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Leone–Zwillinger,* on the brief).

*Richard L. Hecker* argued the cause for respondent P.L.M. (*Hecker, Brown, Sherry and Johnson,* attorneys; *Roann L. Pope,* on the brief).

*Robert H. Ayik* argued the cause for respondent A.A.M. (*Montano, Summers, Mullen, Manuel, Owens & Gregnio,* attorneys; *Mr. Ayik,* on the letter brief).

The opinion of the court was delivered by

WEFING, J.S.C. (temporarily assigned).

This matter is before the court on appeal from a judgment of the Superior Court, Chancery Division, Family Part, which denied the application of the Division of Youth and Family Services (DYFS) to terminate the parental rights of P.L.M. in connection with her daughter A.A.M. Although we recognize that applications to terminate parental rights pose to our judicial system "an almost insoluble dilemma," *New Jersey Div. of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986) (hereinafter "*A.W.*"), our review of the record in this case has led us to conclude that the judgment entered below should be reversed. We are compelled to set forth the record in this matter at some length to explain the result we reach.

## I.

A.A.M., the subject of these proceedings, was born on March 11, 1990. At the time of A.A.M.'s birth, her mother, P.L.M., was fifteen years old. P.L.M. lacked any adequate family structure, having come under the care and custody of DYFS herself in 1985

when she was nine years old and placed in foster care. P.L.M. has remained in the custody of DYFS since then.

P.L.M.'s contact with DYFS predated the 1985 placement, however, for her family had been under DYFS supervision since 1982. For most of P.L.M.'s life, her mother has been addicted to narcotics and her father, who does not live in New Jersey, has served time in prison, as has her oldest brother. She has six brothers and sisters; each of her siblings has a different father. In August of 1989, when P.L.M. was several months pregnant, DYFS arranged for a Child Study Evaluation to be performed. The social service evaluation noted that at that time P.L.M.'s mother was 36, several months pregnant herself and a grandmother.

P.L.M.'s first placement in a foster home lasted slightly more than a year and DYFS then placed her in a pre-adoptive home, where she remained for more than two years. She made an unsubstantiated allegation of sexual abuse against that family which resulted in the family's request that she be removed.

She next stayed briefly with her mother but was removed when she physically assaulted her six-month-old brother. This occurred in March of 1989, when P.L.M. was almost 14. Each of the various subsequent placements made by DYFS for P.L.M. has failed due to her aggressive, sometimes violent behavior and her inability to control her actions.

Following the assault on her infant brother, P.L.M. was placed in the Atlantic County Juveniles In Need of Supervision (JINS) Shelter. After only fifteen days, DYFS was asked to remove her from JINS due to her behavior. DYFS arranged an interim emergency placement for P.L.M. at Harborfield's Females In Transition (FIT) Program, but she was again asked to leave after five days because of her sexual and physical behavior problems. DYFS then secured a foster home for her from which she ran away. When P.L.M. was finally located, DYFS arranged for her to go to Beta House, a residential group home for girls in Camden County. Upon her arrival at Beta House in July 1989, it was

discovered that P.L.M. was pregnant and suffering from venereal disease and chlamydia. She stayed thirteen days at Beta House, which also asked that she be removed. The discharge assessment at Beta House noted that during her stay she was "erratic, dysfunctional, dissocial, and entirely uncontrollable, i.e. 1) disruptive to the therapeutic milieu, 2) hard to handle by staff, 3) uncooperative, 4) verbally and physically abusive toward staff and peers."

P.L.M. returned briefly to her mother, who was again unable to care for her. She was then reassigned temporarily to Harborfield while DYFS attempted to find a foster home for her. DYFS secured such a foster placement by August of 1989. While she was staying at this foster home, DYFS requested the Bancroft Evaluation and Treatment Center to perform a Child Study Team Evaluation upon P.L.M. She was found to have mild mental retardation and additionally, the psychiatric impression was that she suffered from Conduct Disorder. P.L.M. remained at this foster home for several months until her refusal to obey a curfew necessitated that she be placed in another foster home. She ran away from this second foster home, and was returned to the prior foster home in early January of 1990 to await the birth of A.A.M. During this time, DYFS arranged for her enrollment in Wee Care, a program designed to teach parenting skills to single, teen-age mothers. After the birth of A.A.M. in March of 1990, the foster home where she had been living would not accept P.L.M. back due to her poor behavior.

DYFS could not locate a foster home which would accept both P.L.M. and A.A.M., and thus placed them separately but in close geographic proximity. DYFS did, moreover, arrange for significant visitation between P.L.M. and A.A.M. while it was attempting to place them together. According to the DYFS records, the initial visitations went well. The records of DYFS note that on April 2, 1990, P.L.M. requested that the visit end early and that the worker was concerned that P.L.M. may be "growing tired of the baby." The description of a visit three days later notes that

P.L.M. had "a bit of an attitude" but did calm down during the visit. Other DYFS casenotes from this time period indicate that as early as March 22, P.L.M. was threatening to run away and was entertaining boys in her room.

DYFS casenotes document seven separate visits between P.L.M. and A.A.M. which occurred in the interim until DYFS was finally able to locate a foster home in which P.L.M. and A.A.M. could reside together. That placement only lasted fifteen days and P.L.M. was again asked to leave because of her uncontrollable behavior, her refusal to follow curfews and her practice of inviting boys back to her room. A.A.M. returned to her original foster home and DYFS arranged another temporary placement for P.L.M. at Harborfield, while efforts to secure a residential placement continued. P.L.M. was again asked to leave Harborfield because of her behavior, and she returned to Beta House in May of 1990. By the time of P.L.M.'s second placement at Beta House, A.A.M. was two months old.

Beta House, however, had only agreed to accept P.L.M. back if DYFS arranged for a one-on-one nurse to deal with her behavior. Even this proved unsuccessful and DYFS was again asked to remove P.L.M. from Beta House.

The second discharge summary from Beta House noted that she had been admitted with a one-on-one nurse:

> due to extremely poor behavior in the past. P's behavior during her stay at Beta House was extremely negative and at times became violent. P's admission with a private one-on-one nurse was so that Beta's staff wouldn't have to deal with P's negative behaviors. Staff often became involved, thus the House became disrupted. The one-on-one nurse as well as staff made every effort to work with and counsel her, to no avail. P was discharged ... on 6/27/90. Due to P's uncontrollable behavior, if another admission is requested, P will be denied.

By the time of P.L.M.'s second placement at Beta House, she had been arrested and charged with use of stolen credit cards. For this, she was placed on probation. P.L.M.'s probation officer arranged for her admission, following the Beta House expulsion, into Vision Quest, a self-described "high impact" program for troubled youngsters. DYFS arranged for three visits between

A.A.M. and P.L.M. during the time P.L.M. was enrolled in Vision Quest.

P.L.M. was unable to complete the Vision Quest program as well. Vision Quest notified DYFS of P.L.M.'s dismissal from the program and noted the following in a letter dated May 14, 1991:

P entered the Vision Quest program on June 27, 1990, and remained at the Wilderness Camp component for over seven months. While at the camp, P was involved in six altercations, and eight incidents requiring crisis intervention. On February 12, 1991, P transferred to the Wagon Train component. Though she remained on the Wagon Train for over two months, P was recently sent back for failure to adjust and being unmanageable in that setting. While at the wagon train component, P continued her need for crisis intervention on at least four occasions and her constant barrage of verbal abuse toward peers resulted in her involvement in two youth altercations.

On May 1, 1991, due to her failure to progress within the wagon train milieu, P was transferred to the Silver Valley Wilderness Camp in Franklin, Pennsylvania. Already, in her short time within this setting, P has been involved in several incidents, has continued her open defiance towards staff, remains verbally abusive toward her peers, utilizes sexual comments to gain the attention of her male peers and continually attempts to provoke her female peers into altercations."

By the summer of 1991, after P.L.M. was discharged from the Vision Quest program having failed to complete it, DYFS began to seek permanent placement for A.A.M. who had resided with the same foster mother throughout P.L.M.'s various episodes. During the summer of 1991, DYFS explored the possibility of placing A.A.M. with family members of P.L.M., but this proved impossible. By the end of August 1991, A.A.M.'s file had been reviewed and accepted for transfer to the Adoption Resource Center (ARC) for the commencement of termination proceedings.

Upon the dismissal of P.L.M. from Vision Quest, DYFS again placed her at Harborfield on a day-to-day basis while it sought a further residential placement for her. By September of 1991, Harborfield refused to keep P.L.M. any longer. DYFS then placed P.L.M. at the Vineland Children's Residential Center, again on a temporary basis while it sought a residential placement. Once at Vineland, P.L.M. was involved in repeated altercations with residents and staff. She twice tried to stab a staff member with a pen, she repeatedly went AWOL, and she spit upon staff

and tried to burn them with cigarettes. She was involved in fights with other residents, attacking one with a torn soda can; she set fires and set off false fire alarms; she threw food and plates in the dining room. Three incidents recorded in the records of the Vineland Children's Residential Treatment Center are sufficient for illustrative purposes. On November 22, 1991, while P.L.M. and another female resident were in the office P.L.M. began to physically attack the other girl while cursing her and threatening to pull out her hair. P.L.M. then asked for a five minute "time out" which was granted. She went outside and crawled back through the office window and again challenged the other resident to a fight. The other resident retreated to the bathroom and P.L.M. followed her and continued her assault and scratched the other resident by the right eye.

The records of December 12, 1991 note that:

Between three and ten, P assaulted a peer, was in and out of supervision too many times to mention, P busted into wherever she wanted to go or be—male units, cafeteria, staffs' office, peers' bedrooms, there was *nothing* and no one capable of controlling this child. P threatened peers—took their belongings enticing them to confront her—

The records of December 13 report:

After escorting P from the outside to our office, she decided to tear our office apart. Everything in the office was torn apart. Bulletin boards were destroyed, phone torn apart, windows were banged, cabinet turned over, etc., etc., etc. P wanted to be put out of here today. Her excessive cursing was terrible. P threatened staff not to touch her. P threatened peers not to say anything to her. P was terrible.

During her stay at Vineland, P.L.M. was evaluated by the staff psychologist. His summary described her as:

A teenager presently functioning at a borderline level of intelligence ... many skills are deficient.... Problem solving skills are poorly developed and P is vulnerable to becoming overwhelmed by demands made on her. All aspects of memory that were measured were deficient. P's selection of goals can be naive and unrealistic. Her mind often wanders and goes to associations or tangents. She frequently misses the points in conversation. She can be preoccupied and difficult to focus on the task at hand. Denial is a strong defensive process with her. Perceptual skills are poorly developed and P is going to show some distortion in her thinking regarding herself, others and the world. She can be a demanding individual who can have little understanding of the rights, needs and feelings of

others. There is a high probability of provocative and beligerant (sic) interaction. She needs supervision and monitoring while working. She continues to be an impulsive and easily irritated teenager. She shows poor frustration tolerance which quickly converts into anger and overt acting out on those feelings.

The discharge report for P.L.M. from Vineland's clinical director said that her diagnosis upon discharge was Conduct Disorder, Adjustment Disorder with Mixed Emotional Features and Learning Inhibition and Borderline Personality Disorder. It noted that during her stay, she had made no progress in complying with the program requirements, in improving her peer relationships or improving her mood problems. It noted rather that she had experienced severe deterioration in her behavior and in therapy.

While P.L.M. was at Vineland, DYFS was aware of the problems she was experiencing and of the probable need to secure alternate placement. Three other programs refused to accept P.L.M. due to her assaultive and disruptive conduct. Willow Glen Academy in Newton is a residential program which did agree to accept her. DYFS wrote to the court, as P.L.M. still remained on probation, to advise it of the plans to attempt placement at Willow Glen. Within that letter, DYFS noted that it considered Willow Glen to be P.L.M.'s "last chance" and that if she did not cooperate there, it would request her emancipation.

On December 20, 1991, P.L.M. was returned to the Atlantic County Family Court and continued on probation. She was ordered to pay restitution for damages at Vineland and was further ordered, as a condition of her probation, to successfully complete the program at Willow Glen Academy in Newton, New Jersey. (Successful completion of the Vision Quest program had earlier been made a condition of her probation. Her failure there was, technically, a violation of her probation and it was necessary to obtain court approval of her entry into Willow Glen.)

P.L.M. was transferred to Willow Glen on January 8, 1992. Six days earlier, DYFS had filed a verified complaint which sought the termination of her parental rights to A.A.M. During her first ninety days at Willow Glen, P.L.M. was involved in at least forty

incidents, some of which were violent and some of which were sexually inappropriate. P.L.M. did show some improvement over the course of the next ninety days.

The trial on DYFS's application to terminate P.L.M.'s parental rights commenced in July of 1992. P.L.M.'s second staffing report from Willow Glen was prepared in May of 1992. At the trial below, her social worker, Michael Schoch, testified as to the improvement which had occurred. He admitted, however, that she functioned best in a highly structured environment where someone else had the responsibility of insuring that she did what she was supposed to do. He further acknowledged that it would be a period of years before she would be able to live without supervision.

Unfortunately, P.L.M. did not continue with her initial improvement. Indeed, the trial court had originally scheduled to give its decision in this matter during the week of September 7, 1992. The original date had to be adjourned, however, because P.L.M. was so violent she could not be transported to court.

While this appeal was pending, DYFS filed a motion to supplement the record to include records of P.L.M.'s conduct at Willow Glen through March of 1993, documentation demonstrating her rejection by a variety of programs, records of her progress (or lack thereof) at several of the programs she had attended prior to Willow Glen and explanatory material about the Vision Quest program. To the extent that the motion relates to material known to the Division at the time of trial, we agree with counsel for P.L.M. that the Division should not be allowed, post-trial, to present evidence it failed to submit to the trial judge. We further agree that it is unfair to P.L.M. to receive at this point evidence of her conduct post-trial for she would have no opportunity to explain or rebut it. We are persuaded, however, that it is appropriate to include within the record the material from Willow Glen Academy from May of 1992, when the second staffing report was prepared, through September 18, 1992, the date of the trial court's oral decision. We do not consider that result to be unfair to P.L.M.

We note, for instance, that the trial court was unable to give its decision on the date originally scheduled because of P.L.M.'s behavior. All parties were thus aware that P.L.M. continued to be unable to control her behavior through the date of the court's oral decision.

A review of those records shows that from June of 1992 through September 13, 1992 fifteen separate incident reports were prepared for P.L.M. for conduct ranging from refusing to follow directions, to attacking staff members and to destroying property by ripping off wallpaper. During this period she also went AWOL.

At the time DYFS filed its complaint for termination of P.L.M.'s parental rights in January of 1992, A.A.M. was not quite two years of age. From the time of her initial voluntary surrender to DYFS after her birth, A.A.M. has spent most of her entire life with one foster mother, with whom she still resides. When she was approximately six weeks of age, a routine physical examination by the pediatrician revealed a vision problem. She was referred to Wills Eye Hospital for further examination. The note of the examining physician there stated that she had very large interior retinal and optic disc colobomas in both eyes and that she had a "poor visual prognosis." He also noted external ear abnormalities. She was then referred to Cooper Hospital for further examination. The examining physician at Cooper concluded that she had some dysmorphism suggestive of prenatal alcoholic exposure and concluded that A.A.M. was at risk for developmental problems. Because of that risk, A.A.M. was seen at Children's Seashore House and was enrolled in their early intervention program when she was seven and one-half months old. She was seen there two times a week. It is clear from a review of the DYFS' casenotes that A.A.M. has received from her foster mother the care and attention that she requires, particularly in light of the multiple handicaps from which she suffers. DYFS presented evidence that A.A.M. is psychologically and emotionally bonded to her foster mother.

## II.

Because the consequences of a determination to sever the ties between a parent and a child are so drastic, it is relief which should be granted only after the court is satisfied, by clear and convincing proof, that the requisite grounds for termination have been established. *A.W., supra,* 103 *N.J.* at 612, 512 *A.*2d 438. "Few forms of state action are both so severe and so irreversible." *Matter of Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992) (hereinafter *"J.C."*) (quoting *Santosky v. Kramer,* 455 *U.S.* 745, 759, 102 *S.Ct.* 1388, 1398, 71 *L.Ed.*2d 599, 610 (1982)). Our Supreme Court has recognized the inherent tension involved in balancing and protecting the "constitutionally-protected, fundamental liberty interest [of parents] in raising their biological children" against the "State's *parens patriae* responsibility to protect the welfare of children." *J.C., supra,* 129 *N.J.* at 9–10, 608 *A.*2d 1312.

In *A.W., supra,* the Supreme Court set forth the findings which a trial court must be able to make before it may enter a judgment terminating parental rights. First, the court must find that the child's health and development either have been or will be seriously impaired by the parental relationship. Secondly, the court must find that the child's parents are either unable or unwilling to eliminate the harm to the child and further that delaying the child's permanent placement will add to the harm for the child. Thirdly, the court must be satisfied that all reasonable alternatives to terminating parental rights have been explored and exhausted. Finally, the court must be satisfied that a judgment of termination of parental rights will not do the child more harm than good. And, as noted, the court must be satisfied that the record establishes each of those four elements by clear and convincing proof. Nothing less will suffice, in light of the fundamental interests at stake in such a matter.

In the later *J.C.* decision, *supra,* the Court held that parental ties may not be terminated solely on the ground that the child has developed a strong emotional relationship with the foster parents.

Rather, DYFS must establish, by clear and convincing evidence, that separating the child from the foster parents would cause the child "serious and enduring emotional or psychological harm." 129 *N.J.* at 19, 608 *A.*2d 1312.

### III.

The trial court recognized these standards and concluded that DYFS had failed to establish all four by clear and convincing proof. The only element which the trial court determined had been satisfied was the first—that A.A.M.'s health and development had been seriously impaired by the parental relationship. The trial court premised this finding on the visual and developmental disabilities from which A.A.M. suffers, attributable to P.L.M.'s prenatal conduct. P.L.M. does not challenge the correctness of that finding on this appeal.

The trial court thereafter concluded that DYFS had failed to establish any of the three remaining elements. As already mentioned, the second required element is a finding that the parents are unable or unwilling to eliminate the harm and that delaying permanent placement will add to that harm. The trial court reasoned that P.L.M. was herself a child and it was thus unable to conclude that in the future P.L.M. would not be able to assume an appropriate maternal role. The trial court also chastised DYFS for what it considered to be its inadequate efforts to arrange visits between P.L.M. and A.A.M. It was the trial court's opinion that P.L.M. had never really had the chance to be a mother.

In reaching these conclusions, we are satisfied that the trial court erred. We set forth at the beginning of this opinion a detailed statement of P.L.M.'s troubled history and the emotional, psychological and behavioral problems which she has experienced. We did so not to cast fault upon her. Indeed, we recognize that she herself has suffered a tragic life; she has been deprived from an early age of essential psychological and emotional family support, and has experienced little but rejection and failure. But sympathy for P.L.M., and an understanding of how her repeated

rejections may lead to rage and striking out, cannot blind us to the *parens patriae* responsibility to consider the needs and the interests of A.A.M. We are satisfied that there is no reasonable probability that P.L.M. will be able to care for A.A.M. in the foreseeable future. Indeed, P.L.M. is unable to handle her own needs, let alone those of a child who has multiple handicaps and is developmentally delayed.

The trial court also found that DYFS had not satisfied the third requirement of *A.W.*, that it consider alternatives to termination. Among the factors to be considered, *A.W.* instructs, is placement with a relative or relatives until a parent can resume custody and care. Our review of the record in this case, including the extensive DYFS casenotes, convinces us that DYFS did explore all reasonable avenues in an effort to place A.A.M. with a family member. The dysfunctional nature of P.L.M.'s family, however, made this impossible. Within the court's oral decision, it questioned why no efforts had been made to explore the possibility of placing A.A.M. with P.L.M.'s grandmother, the one family member with whom P.L.M. did successfully visit on occasion. The DYFS casenotes, however, note that P.L.M.'s grandmother was seventy-seven years of age and suffered from heart trouble and severe arthritis. She is clearly unable to care for a three-year-old child, particularly one with A.A.M.'s disabilities.

We note that the trial court criticized DYFS for not doing more to reunite A.A.M. with a family member to work toward the eventual goal of reunification with P.L.M. *A.W., supra,* however, recognizes that situations exist in which efforts to reunite a family may "no longer be reasonable" and gives as examples "parents [who] threaten workers, child, foster parents, or therapists." 103 *N.J.* at 610, 512 *A.*2d 438. We acknowledge that there is nothing in this record of any threat by P.L.M. to A.A.M., but the record is replete with P.L.M.'s violent, assaultive behavior toward others. The extensive record of such conduct in this matter, continuing over such a period of time, indicates to us that DYFS was entirely

justified in concluding that an effort to reunite P.L.M. and A.A.M. was "no longer reasonable."

The trial court also concluded that DYFS had failed to establish the fourth element under *A.W.*, that termination would not do more harm than good. It reached this conclusion with the observation that the only harm whose anticipated occurrence had been proven, was the fracture of the bonds which have developed between A.A.M. and her foster mother, whose adoption of A.A.M. had been contemplated if termination had been granted. We interpret the court's oral opinion in this regard to indicate that it found that harm would occur to P.L.M. if termination were granted, since it would deprive her of the opportunity to be reunited with A.A.M. if her behavior so warranted at some point in the future.

As to this fourth element, that termination not do more harm than good, Justice O'Hern explained in *A.W.* that the concept of potential harm was to be analyzed in terms of the child, not the contesting biological parent. Termination of parental rights in a contested matter will, by definition, cause intense pain to the unsuccessful parent and will permanently deprive that individual of one of the most basic of human relationships. As Justice O'Hern indicated, termination should not ordinarily be granted when there is not an existing adequate plan for the child's permanent placement. The reason, of course, is that termination in such a situation may not lead to any improvement in the child's life but rather leave the child in an extended state of limbo, with the relationship with biological parents having been terminated but not replaced with a permanent substitute.

Here, however, there was no question of the existence of a plan for permanent placement. A.A.M. has resided with her foster mother since she was four days old, with the exception of the brief time that she and P.L.M. were placed together, a situation which P.L.M.'s own behavior aborted. A.A.M.'s foster mother intends to adopt A.A.M. once termination is granted. Thus, a permanency

plan exists and is ready to be implemented upon termination of P.L.M.'s rights.

We have concluded that the judgment entered below must be reversed. We remand the matter for entry of judgment terminating P.L.M.'s parental rights over A.A.M. and granting custody of A.A.M. to DYFS so that the contemplated adoption of A.A.M. by her foster mother may be consummated.

### IV.

We feel compelled to note our discomfit at the methodology employed in the concurring opinion, even though it reaches the same conclusion—that P.L.M.'s parental rights to A.A.M. must be terminated. We noted at the outset of this opinion that applications to terminate parental rights inevitably involve the judicial system in dilemmas which *A.W.* accurately characterized as "almost insoluble" 103 *N.J.* 591, 599, 512 *A.2d* 438. *A.W.*, and its statutory counterpart, *N.J.S.A.* 30:4C–15.1, articulate the threshold findings which are required before a parent may be stripped of such fundamental rights. We believe that that articulation provides a far surer protection of the rights of the individuals involved than does a test formulated upon whether one is unfit or unable to be a parent. We further believe that that standard is appropriate to use in this matter.

A.A.M. resided with P.L.M. for a brief period in a placement arranged by DYFS. It was P.L.M.'s own conduct which prevented that from continuing and required their separation. That P.L.M. may not have physically harmed or assaulted A.A.M. in that interval does make *A.W.* inapplicable; rather, P.L.M.'s uncontrollable behavior harmed the relationship with A.A.M. by preventing it from progressing further. P.L.M.'s inability to control her behavior in any meaningful way, which has continued for years after A.A.M.'s birth, clearly shows that she lacks the ability to eliminate that harm.

To ask a court to terminate parental rights is to impose upon it an agonizing burden in any case. To ask a court to terminate

parental rights because the individual lacks "the fundamental personal qualities necessary for minimally adequate parenting" is to present the trial judge with a decision that would tax Solomon. And to empower a court to terminate parental rights on such grounds raises the possibility of grave misuse in the future. There is no need to adopt such a standard in this case. DYFS established the four elements required under existing law in New Jersey to terminate P.L.M.'s parental rights to A.A.M. That is sufficient to conclude the matter.

Reversed and remanded.

KESTIN, J.A.D., concurring.

Although I agree that P.L.M.'s parental rights should be terminated, I reach this result by a route different from that traversed by my colleagues. I do not see parts (1) and (2) of the test of *New Jersey Division of Youth and Family Services v. A.W.*, 103 *N.J.* 591, 604–607, 512 *A.*2d 438 (1986), as they are conventionally understood, to apply in any helpful way to resolve the matter before us, even with the broadening gloss provided by *In re Guardianship of J.C.*, 129 *N.J.* 1, 608 *A.*2d 1312 (1992). To attempt to decide this case by the first two standards of *A.W.* is like trying to dress a small child in the parent's suit of clothes. The fit is wrong.

The facts of *A.W.*, as well as the very terms of parts (1) and (2) of its test, suggest that the standards articulated therein were designed for situations in which identifiable parental fault has occurred, framed generally, and to satisfy constitutional requirements, in terms of abandonment or unfitness. *See Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982); *Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 133–34, 631 *A.*2d 928 (1993). Those standards of *A.W.* have no more ubiquitous application. The Legislature's rearticulation of the *A.W.* standards in *N.J.S.A.* 30:4C–15.1, enacted in 1991, appears to have broadened them, however. For example,

> The division shall initiate a petition to terminate parental rights on the grounds of the "best interest of the child" pursuant to [*N.J.S.A.* 30:4C–15(c) ] if the following standards are met:
>
> \*        \*        \*        \*        \*        \*        \*        \*
>
> b.  *The parent* is unwilling or unable to eliminate the harm facing the child or *is unable* or unwilling *to provide a safe and stable home for the child* and the delay of permanent placement will add to the harm; (emphasis supplied).

The emphasized language establishes a standard that cannot be expressly found in *A.W.*

We are here confronted with a situation in which there was no parental fault in the relational sense, except for the possibility that P.L.M.'s ingestion of harmful substances during pregnancy could have been the cause of her child's physical disabilities and developmental deficits.  If this were the parental fault upon which the petition for guardianship was based, the basic factual premise and its causal relationship to the child's condition would need to have been established by clear and convincing proof.  There was no such proof in this case.  Yet, even if present, such proof would not constitute a valid basis for terminating parental rights under the standards of *A.W.* or the more recently enacted statute.  It is clear from *A.W.* that the purpose of termination is to protect the child from future harm from the "parental relationship," 103 *N.J.* at 604, 512 *A.*2d 438, not to punish the parent for past transgressions against the child *in utero* or *in esse.  See also N.J.S.A.* 30:4C–15.1.  It is continuing relational harm that is the focus of the requirement that the parent be "unable or unwilling to eliminate the harm." *A.W., supra,* 103 *N.J.* at 605, 512 *A.*2d 438. Under *A.W.*

> [p]arents are not to be adjudged unfit because they lack resources or intelligence, but only by reason of conduct detrimental to the physical or mental health of the child, specifically in the form of actual or imminent harm.  Children are therefore not removed from their parents absent such a showing of harm.

[*Id.* at 616, 512 *A.*2d 438.]

In this case, P.L.M. never had a real opportunity to exercise a parental role, and there is no proof that she inflicted the type of harm contemplated by the court in *A.W.*  The child, A.A.M., was

removed from P.L.M.'s care and custody when only four days old, because the Division of Youth and Family Services (Division), due largely to P.L.M.'s behavioral history, could not find a home willing to take both the mother and the child. When a willing foster home was finally found, the placement lasted only fifteen days because P.L.M.'s unacceptable behavior made her unwelcome. As a result, P.L.M. has had no effective opportunity to relate to the child as a parent and, therefore, no opportunity to demonstrate her capacity to parent without inflicting harm on the child or, more accurately, to establish a factual predicate for a contrary showing that would satisfy the clear and convincing proof standard. Consequently, no factual basis exists for the necessary findings that "[t]he child's health and development have been or will be seriously impaired *by the parental relationship*," 103 *N.J.* at 604, 512 *A.*2d 438 (emphasis supplied); *see also N.J.S.A.* 30:4C–15.1a, or that the parent is "unable or unwilling to *eliminate the harm* and delaying permanent placement will *add to the harm*," 103 *N.J.* at 605, 512 *A.*2d 438 (emphasis supplied); *but see N.J.S.A.* 30:4C–15.1b.

Yet, it is as clear to me as it is to my colleagues that the best interests of this child require termination of P.L.M.'s parental rights. *N.J.S.A.* 30:4C–15(c). The basis upon which I am able to reach this conclusion is amply established in the evidence, entirely aside from considerations of the extent to which bonding has occurred between A.A.M. and her foster family. This parent, P.L.M., by dint of her personal qualities, temperament, and conduct is simply incapable of discharging the day-to-day functions of parenthood, let alone applying more recondite but no less important qualities such as altruism, caring, empathy, flexibility, sacrifice, stability and understanding that every parent must have to some significant extent in order to be equipped to provide the nurture that all children require and deserve. *See, e.g., A.W., supra,* 103 *N.J.* at 610, 512 *A.*2d 438. The record shows that P.L.M., a child herself when measured by years and attitude, is unstable, violent, self-centered, undisciplined and lacking in in-

sight. I conclude from these factors that P.L.M. is "unable to provide a safe and stable home" for A.A.M. *N.J.S.A.* 30:4C–15.1b.

No parent could reasonably be expected to be a perfect blend of the universe of qualities which ideal parenthood bespeaks. Reality and decency require that an indulgent appraisal of an individual's capacity to parent be undertaken, especially when a court is called upon to consider terminating such precious rights. But, even with the benefit of every reasonable doubt, and by the most permissive test, this respondent simply lacks the capacity to be a minimally competent parent. *See A.W., supra,* 103 *N.J.* at 614–15, 512 *A.*2d 438. *See also In re Guardianship of J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312. I reach this conclusion wholly apart from the fact that the child, A.A.M., is visually impaired with a poor prognosis and that she is physically and developmentally at risk in other ways, although my conviction that this respondent is incapable of being a minimally competent parent for this child is reinforced by the youngster's problems.

It is not easy or pleasant to label a person unfit as a parent. While this sad duty befalls us on the facts presented we can only hope that growth and maturation will help this respondent to become a responsible adult with the capacity to care about others. At this time and on this record, however, our duty to promote the best interests of this child as a matter of present concern and foreseeable consequence impels us to the decision we have reached. *N.J.S.A.* 30:4C–15(c). *See In re Guardianship of J.C., supra; Sorentino v. Family & Children's Soc'y. of Elizabeth,* 74 *N.J.* 313, 378 *A.*2d 18 (1977) (Sorentino II).

Although it is appropriate to hope for better for the respondent mother, we are, in respect of the child, obliged to act on a basis more concrete than hope. If a court is empowered to consider a parent's lengthy incarceration as a relevant factor in determining whether abandonment has occurred or unfitness exists, *i.e.,* "whether the parent is incapable of properly caring for the child," *see In re Adoption of Children by L.A.S., supra,* 134 *N.J.* at 136, 631 *A.*2d 928, then it seems to me obvious that a court may reach

the necessary conclusion because the parent clearly and convincingly lacks too many of the basic personal qualities required to give any child minimal care and nurture, *Id.* at 140, 631 *A.*2d 928; *In re Guardianship of J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312, or to give a particularly needful child the special attention she requires. At bottom, the basic criterion, confirmed by the introductory language of *N.J.S.A.* 30:4C–15.1, is the "best interests of [the] child" standard of *N.J.S.A.* 30:4C–15(c).

A conclusion to terminate parental rights on the basis I would use cannot be reached without grave concern that the standard it applies might be misunderstood and misused in the future. A decision that parental rights be terminated because of a lack of the fundamental personal qualities necessary for minimally adequate parenting should not be lightly reached. Such a conclusion is defensible only if the proofs demonstrate, clearly and convincingly, that basic parenting qualities are irredeemably absent to such a degree that there is no reasonable prospect that the child will, in the approaching future, derive from this parent even a modicum of the relational benefits to which every child is entitled. *In re Guardianship of J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312. Clearly also, the more general third and fourth parts of the *A.W.* test are applicable in such cases. A judgment of termination should not be entered in any case unless the court finds, in addition to parental unfitness, that it "has considered alternatives to termination" and that "[t]he termination of parental rights will not do more harm than good." *A.W., supra,* 103 *N.J.* at 608–11, 512 *A.*2d 438; *N.J.S.A.* 30:4C–15.1c, d. I agree with my colleagues in this regard; it is beyond question that the Division has satisfied these latter standards in this case.

A.A.M. is—by statute, case law, and common sense—entitled to permanency in a filial relationship that is, at the very least, minimally stable and responsive to her general and special needs. *In re Adoption of Children by L.A.S., supra,* 134 *N.J.* at 139, 631 *A.*2d 928. If the birth parent is incapable of providing care on a basic level for the particular child, that child's best interests

require the parental tie to be severed so that she may, with permanency, be taken into a reasonably capable, loving, and giving environment that will provide the care and attention she requires. This is as important and basic an individual right of the child as the status of parent is to the mother.

The record in this matter is replete with proofs that this parent, P.L.M., at this time, simply lacks the personal qualities that would render her capable of discharging her parental responsibilities in even the most elemental ways. I can discern no reasonable prospect that her present deficiencies will be remedied in the near future. Therefore, respondent's incapacity must, in the best interests of the child, be seen, clearly and frankly, as an adequate basis for terminating her parental rights. *N.J.S.A.* 30:4C–15(c).