# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5048-17T4
                A-5049-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.M. and J.R.M.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.M.,
KI.M., Y.M., and N.M.,

     Minors.

_____

Argued October 3, 2019 – Decided October 28, 2019

Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0029-18.

Meghan K. Gulczynski, Designated Counsel, argued the cause for appellant J.M. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Meghan K. Gulczynski, on the briefs).

Marc D. Pereira, Designated Counsel, argued the cause for appellant J.R.M. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Marc D. Pereira, on the brief).

Sara M. Gregory, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Patricia J. O'Dowd, Deputy Attorney General, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel Christian Devlin, of counsel and on the brief).

PER CURIAM

Defendants J.M.[1] (Julissa) and J.R.M. (Jorge) appeal from a judgment terminating their parental rights to their daughters KI.M. (Kelly), born in 2004; Y.M. (Yvette), born in 2005; N.M. (Narissa), born in 2008; and K.M. (Kara), born in 2016. The Law Guardian on behalf of the four children also appeals.[2]

---

[1]  We use initials and pseudonyms to preserve the privacy of the parties. R. 1:38-3(d)(12).

[2]  The Law Guardian categorizes its appeal as a cross-appeal. We view it as an appeal.

The parents assert that the trial court erred in finding that the Division of Child Protection and Permanency (Division) satisfied all four prongs of the best interests of the child test set forth in N.J.S.A. 30:4C-15.1.

The parents and children also contend that the court erred by refusing to admit evidence concerning their recent progress in substance abuse treatment. Julissa also argues that her counsel's failure to obtain this evidence and advocate for its admission in a timely fashion constituted ineffective assistance. We reverse and remand to the trial court to consider alternatives to termination because the court did not allow Julissa to introduce evidence of her recent drug rehabilitation. Also, most importantly, after the close of trial the children were placed with a relative in Pennsylvania, and the three older girls through counsel express their preference for Kinship Legal Guardianship (KLG), N.J.S.A. 3B:12A-6(d), rather than termination of parental rights. We thus reverse the order of termination and remand for the court to determine whether, in light of recent events, including the parents' drug rehabilitation and the new placement, termination of parental rights would do more harm than good. Such a determination requires an expedited comparative bonding evaluation and subsequent hearing.

3

At the time of Kara's birth in 2016, the Division could not locate Jorge. Julissa tested positive for heroin and cocaine, admitted to using heroin throughout her pregnancy, and said she had received no prenatal care. Kara suffered from drug withdrawal symptoms, requiring treatment in neonatal intensive care. The three older girls were living with relatives, where the parents had placed them. Jorge was located about five months after Kara's birth.

The parents were afforded supervised visitation, which Julissa attended fairly regularly and Jorge attended assiduously after he was located. The three older children were always happy to see their parents and interacted well during visits. The Division evaluated relatives and moved the children when a willing and eligible relative was available. Unfortunately, these placements did not work out.

Since the litigation began in 2016 when Kara was born, the children were moved six times, twice to unrelated resource homes and four times to various relatives, including after trial when they were moved to their current placement in Pennsylvania with a maternal aunt. Although they were initially separated into three resource homes, all four girls are currently living together.

4

## I. Legal standard.

Our review of a decision to terminate parental rights is limited. <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 N.J. 596, 605 (2007). We must determine whether the decision is supported by substantial and credible evidence. <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 448 (2012). We defer to the trial court's factual findings, because that court has "the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." <u>Ibid.</u> The conclusions that flow from those findings are also entitled to deference. <u>N.J. Div. of Youth & Family Servs. v. R.L.</u>, 388 N.J. Super. 81, 89 (App. Div. 2006). Ultimately, a family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." <u>F.M.</u>, 211 N.J. at 448 (quoting <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 104 (2008)).

"Parents have a constitutional right to raise their children," <u>id.</u> at 447, but it is "tempered by the State's . . . responsibility to protect the welfare of children." <u>In re Guardianship of J.N.H.</u>, 172 N.J. 440, 471 (2002). Nevertheless, because termination permanently severs the legal relationship between parent and child, it should be ordered only where "proof of parental unfitness is clear." <u>F.M.</u>, 211 N.J. at 447.

The court must focus its inquiry upon the best interests of the child.  <u>Ibid.</u> Parental rights should only be terminated when:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. . . .
>
> (3) [The Division] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

These four criteria "are not discre[te] and separate, but overlap with each other . . . to identify a child's best interests." <u>N.J. Div. of Youth & Family Servs. v. A.G.</u>, 344 N.J. Super. 418, 434 (App. Div. 2001).

The burden is upon the State to "demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." <u>In re Guardianship of</u>

J.C., 129 N.J. 1, 10 (1992). "[A]ll doubts must be resolved against termination of parental rights." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

## II. Prong One.

Julissa argues that the court wrongly found that her inability to care for her daughters during the life of the case was a harm that satisfied the first prong, because this inability stemmed from her "focus on her recovery" from drug addiction and there was no "specific evidence" that the girls suffered as a result of the parental relationship. Jorge contends that the court ignored evidence that he interacted positively with the children during visitation and thus "established a proper parenting relationship" with them. He asserts that the record shows that he "is a dedicated and fit parent" despite his addiction.

Under prong one, the harm caused by the parental relationship "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., 161 N.J. at 352. The focus is not on a single or isolated harm, but on "the effect of harms arising from the parent-child relationship over time on the child's health and development." Id. at 348.

The trial court found that all the children suffered a harm under prong one. First, Kara suffered drug withdrawal symptoms at birth as a result of Julissa's substance abuse. Defendants' "continued inability to provide stability for the

7

course of [the] two year litigation is also a cognizable harm." The court opined that the risk that defendants could not provide day-to-day care for the girls was "very high" because they "[had] not made significant improvements to their mental health and substance abuse issues." Finally, the court found that Jorge's absence from the time of the girls' removal was another example of instability.

We have affirmed trial court findings of prong one where a parent suffers from addiction, if it is "entrenched" and has a negative effect on the parent's life and on the stability of the child's home. N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013). For example, in J.N.H., the Court affirmed a finding of prong one where a mother and child were affectionate during visitation, but the mother was addicted to drugs, made "no progress" with rehabilitation, left the child alone to buy drugs, "refuse[d] to take responsibility for her actions[,] and blame[d] others for her problems." 172 N.J. at 448–56. See also E.P., 196 N.J. at 105 (where the mother repeatedly relapsed into addiction, resulting in homelessness, unemployment, and a prison sentence); N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (where drug-addicted parents had not completed treatment and did not have stable housing); K.H.O., 161 N.J. at 349–54 (where addiction prevented the parent from "providing care and nurture or a stable home"); H.R., 431 N.J.

Super. at 224 (where father enrolled in drug treatment programs but "routinely failed to complete them with positive results"). "[P]roof that a child is suffering from withdrawal symptoms at birth" may also "establish actual harm" to that child. N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 22 (2013).

Kelly, Yvette, and Narissa were subjected to instability beginning when Julissa sent them to live with relatives in 2014. Kelly suffered from suicidal ideation and self-harm. The Division's expert psychologist, Dr. Robert Kanen, opined that the older daughters were "parentified," and too preoccupied with their parents' issues to engage in age-appropriate developmental and social activities, and had learned that they could not rely on their parents.

While Julissa's choice to shield the children from her drug use by sending them to live with relatives was protective, she failed to fully comply with substance abuse treatment programs until just a few months before trial. Kara suffered through withdrawal, and all of the children were subjected to the harms associated with multiple shifting placements. The court did not abuse its discretion in finding that the Division established prong one by clear and convincing evidence.

A-5048-17T4

Julissa argues that the court's finding that she failed to ameliorate her substance use disorder was unsupported, because the record showed that she engaged in appropriate treatment and was improving.  Jorge similarly contends that at the time of the trial, he was regularly attending substance abuse services and "needed only time to complete treatment."  He further challenges the court's findings that he had unstable housing and did not consistently attend visitation, arguing that he had lived in the same home for years and had missed only three visits during the life of the case.

Under prong two of the best interests test, the Division must demonstrate that a parent is unable or unwilling to correct the circumstances that led to the agency's involvement or that he or she cannot provide a safe and stable home for the child, thus delaying permanency.  K.H.O., 161 N.J. at 348–49.  "The question is whether the parent can become fit in time to meet the needs of the child."  N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010).

The court found that after the children were removed, both defendants "failed to complete the court ordered substance abuse treatment and have continued to test positive for illegal substances."  It listed several positive drug

test results and missed appointments at services in support of this finding. The court also credited Kanen's testimony that defendants "would not be able to provide a stable and nurturing home for their children" in the foreseeable future. It also found credible Kanen's testimony that both defendants had "severe parenting defects" due to their substance abuse, cognitive limitations, and history of unstable housing and employment.

As with prong one, a court may consider a parent's substance abuse and failure to complete treatment when evaluating prong two. The K.H.O. Court stated:

> the second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O, 161 N.J. at 353.]

In P.P., the parents had recently enrolled in drug treatment programs after years of failing to do so. 180 N.J. at 512. The Court affirmed the termination of their rights because they had never finished a substance abuse, parenting skills, or vocational program, were not at time of trial "in a position to care for their children," and did not present any evidence that they would be in such a

11

position soon.  Ibid.  In H.R., we found that prong two was established where a father enrolled in substance abuse programs but did not complete them, admitted continuing to use illegal drugs, and sometimes refused drug testing or "conducted himself in a manner during urine screens that caused suspicion about their validity."  431 N.J. Super. at 224.

Julissa enrolled in and successfully completed a substance abuse program and continued to attend services with two rehabilitation services.  Contrary to the trial court's findings, she did not "continue[] to test positive for illicit substances" by the time of the trial, and had apparently been drug-free since she entered inpatient treatment in late March 2018, a period of approximately two months.

Despite the court's apparently factually incorrect finding about Julissa's recent drug tests, this case is similar to P.P. in that Julissa made some progress toward complying with treatment and maintaining sobriety closer to trial.  As in P.P., however, the trial court found these efforts were too late to defeat the Division's evidence of prior relapses, noncompliance, positive drug tests, coming to visits with the children while under the influence and missing or being very late to visits, and other issues demonstrating that Julissa was not able to safely care for her daughters.

12

Jorge's evidence of compliance with treatment is even weaker. Contrary to his assertion on appeal that he missed only three visits with the girls, he missed several months' worth of visits from the time of their removal until he finally made himself known to the Division, and the visits he missed thereafter were due to arrests for drug and theft-related crimes. The Division's evidence established that Jorge could not provide a safe and stable home for them. Kanen's testimony that both defendants would be incapable of parenting their daughters for the foreseeable future due to their substance abuse issues and cognitive limitations was unrebutted.

Both defendants demonstrated an inability to comply with sufficient services to reunite with their daughters in a timely fashion, and the trial court was not required to afford them more time to do so while the girls lingered in foster care without permanency. The trial court's determination by clear and convincing evidence that defendants were unwilling or unable to eliminate the risk of harm to the children under prong two was supported by substantial credible evidence.

13

## IV.  Prong Three.

### A. Reasonable efforts.

Julissa contends the Division did not offer her sufficient visitation with Kara for the two to form a bond, or proper mental health counseling related to her own childhood trauma.  Jorge argues that the Division did not refer him for individual therapy.  He also contends that the Division did not give him adequate time to complete his substance abuse treatment before pursuing termination.

The court found that the Division offered both parents substance abuse and mental health treatment.  It recognized Julissa's argument that the treatments offered were insufficient because "it was unclear whether individual psychotherapy had been offered."  Nevertheless, the court concluded the record was "replete with the Division's efforts at providing services," but that defendants' compliance had been "inconsistent at best."  It further found that the Division had provided adequate visitation.

The court also found that the Division considered all relatives put forth by defendants, stating that the Division's "exhaustive efforts" had included "interstate options."  The court concluded that the Division established prong three by clear and convincing evidence.

A-5048-17T4

Under N.J.S.A. 30:4C-15.1(c), the term "reasonable efforts to provide services" under prong three means "attempts by [the Division] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." "[A]n evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis." In re Guardianship of D.M.H., 161 N.J. 365, 390 (1999). "'Reasonable efforts' will vary depending upon the circumstances of [a child's] removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007). The Division must focus on reunification, and the services utilized to facilitate this must be "coordinated" and have a "realistic potential to succeed." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012). Nevertheless, "[t]he diligence of [the Division's] efforts on behalf of a parent is not measured by their success," D.M.H., 161 N.J. at 393, particularly where their lack thereof is due to a parent's "failure to cooperate or follow through" with services and obligations. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

The trial court reasonably determined that the Division made diligent efforts to provide services to defendants. The Division referred the parents to numerous substance abuse programs, as their drug use was the issue that led to

15

the children's removal. The testimony that both defendants also received individual therapy and mental health-related counseling at some of their substance abuse programs was unrebutted and remained consistent during cross-examination. Jorge's argument that the court should have permitted him more time to complete substance abuse treatment is unpersuasive and his repeated noncompliance with such services did not render the Division's efforts insufficient under prong three. See D.M.H., 161 N.J. at 390; C.S., 367 N.J. Super. at 119.

Julissa's argument that the Division did not provide adequate visitation with Kara to facilitate their bond is unpersuasive. Weekly visits were provided. As the trial court held, the Division established the "reasonable efforts to provide services" aspect of prong three by clear and convincing evidence.

### B. Alternatives to termination.

Both defendants and the Law Guardian argue that the court did not adequately consider alternatives to termination. At the time of trial, the Division had only begun assessing the children's Pennsylvania maternal aunt, and they assert that the court erred by continuing the trial without an adjournment to allow the agency to complete this work. They contend that termination was premature under the circumstances, and that a remand is necessary to consider whether

16

KLG with the aunt would be an appropriate alternative to termination. The Division has a general policy to "place children with relatives whenever possible." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 579 (App. Div. 2011) (quoting N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003)).

As an alternative to termination of parental rights and adoption, under N.J.S.A. 3B:12A-6(d), a court "shall appoint [a child's] caregiver as a kinship legal guardian" if it determines that: 1) the parents are "unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child"; 2) their incapacity is "unlikely to change in the foreseeable future"; 3) the Division has exercised reasonable efforts at reunification but was unsuccessful and "adoption of the child is neither feasible nor likely"; and 4) "awarding [KLG] is in the child's best interests." A "[c]aregiver" is a person over eighteen years old "who has a kinship relationship with the child and has been providing care and support for the child, while the child has been residing in the caregiver's home, for either the last [twelve] consecutive months or [fifteen] of the last [twenty-two] months." N.J.S.A. 3B:12A-2. "Kinship relationship" includes "a family friend or a person with a biological relationship or legal relationship with the child." N.J.S.A. 3B:12A-2.

KLG is intended to provide "an alternative, permanent legal arrangement" for children when a caregiver is unwilling or unable to adopt. P.P., 180 N.J. at 508. In a recent decision we emphasized that the record in a case must demonstrate that a caretaker is "committed unambiguously, unequivocally, and unconditionally to adoption, regardless of the possible alternative of KLG." N.J. Div. of Child Protection & Permanency v. M.M., 459 N.J. Super. 246, 273 (App. Div. 2019). We also determined that the KLG Notification Act, N.J.S.A. 30:4C-89 to -92, requires that the caregiver be "fully informed of the potential benefits and burdens of KLG before deciding whether he or she wishes to adopt." Id. at 261, 263. In M.M., the only evidence that the grandmother and great-aunt, who had been taking care of the children, wanted to adopt was several ambiguous hearsay statements to that effect, which were undermined by other statements that these relatives would prefer KLG. Id. at 265–75. We concluded that this was insufficient, and remanded the matter for further proceedings "to develop the record more definitively" and thus ensure that the defendants' parental rights were not terminated prematurely when KLG could have provided an alternative. Id. at 275. See also H.R., 431 N.J. Super at 233 (remanding to "establish on the record" that a caregiver aunt had been fully informed about KLG and had indicated a clear preference to adopt).

N.J.S.A. 30:4C-15.1(a)(3) places a burden not only on the Division to demonstrate to the court that it has explored alternatives to termination including relative resource placement, but also explicitly on the court to "consider[] alternatives to termination of parental rights."  During trial, the Division revealed that it had just the day before heard from Julissa's sister, who had been ruled out previously but whose circumstances had changed and who apparently became licensed as a foster parent in Pennsylvania without contacting the Division.  The Division had begun the process of reevaluating the maternal aunt as a resource placement.

"The Division need not file a petition to terminate parental rights if a 'child is being cared for by a relative and a permanent plan for the child can be achieved without termination . . . .'"  K.L.W., 419 N.J. Super. at 579 (quoting N.J.S.A. 30:4C-15.3(a)).  Additionally, KLG does not remove the natural parents' obligation to pay child support and maintains the natural parents' right to visitation with their children.  P.P., 180 N.J. at 508.  The natural parents also retain "the right to seek termination of the guardianship and a resumption of custody if at a later day [they are] able to provide a safe and secure home for the child[ren]."  N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003).  While the aunt could not have been appointed a kinship legal

guardian immediately because she had not been caring for the children for the requisite period of time under N.J.S.A. 3B:12A-2, she may now prefer to act as a KLG. The record as of the time of trial contained only one hearsay statement by the aunt, indicating she would care for the girls long-term and was willing to adopt all four children but "not immediately." Under M.M., this is not the type of "unequivocal" and "unconditional" statement of a desire to adopt that would render KLG an unavailable alternative. Because it is now unclear whether KLG has been fully explored, we remand for clarification.

## V. Prong Four.

Julissa and the Law Guardian contend that termination would do more harm than good because Kelly, Yvette, and Narissa stated a desire not to be adopted. Jorge makes similar arguments, and adds that Kanen's testimony was insufficient to support the court's prong four finding because the doctor did not individually evaluate the children or perform a comparative bonding evaluation with any of their then-current foster parents.

In evaluating prong four, a court must inquire into the child's relationship with his or her parents. K.H.O., 161 N.J. at 355. There is an inherent risk to children stemming from the loss of the care of a parent. Ibid. However, a court must also consider the "paramount" need for children to have "permanent and

defined parent-child relationships." J.C., 129 N.J. at 26. As a result, prong four "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

Prong four addresses whether termination "will not do more harm than good," N.J.S.A. 30:4C-15.1(a)(4), and the concept of potential harm must be "analyzed in terms of the child, not the contesting biological parent." In re Guardianship of A.A.M., 268 N.J. Super. 533, 546 (App. Div. 1993). As a result, a court may consider whether a parent has taken steps to eliminate the risk of harm to the child when deciding whether the Division has established this prong. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 286–87 (2007) (established where father did not eliminate danger and instability from household); K.H.O., 161 N.J. at 357 (established where mother did not demonstrate that she would become capable of parenting child "in the foreseeable future"); H.R., 431 N.J. Super. at 226–27 (established where father had "been given enough time to show a likelihood of overcoming his addiction").

Prong four is considered "a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights" even where the other three prongs of the best interests test have been met. F.M., 211 N.J. at 453. For

example, in E.P. the Court affirmed the trial court's findings that a mother had endangered her child's welfare through her drug abuse and instability, had not demonstrated that she was willing and able to remove that harm as of the time of trial, and had not complied with services until recently. 196 N.J. at 103–05. It went on to note that the child had been moved through several resource placements during the life of the case; that none of these placements were pre-adoptive; and that the child had suffered from mental and emotional distress at the thought of losing her mother, which had manifested in suicidal ideation and self-harm. Id. at 99, 108–10. The Court found that there remained only a "slim hope of adoption" for the teenager, and that "her mother's love and emotional support" had been "the one sustaining force" in her life. Id. at 109.

As a result, explaining that "terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child," the Court concluded that the trial judge erred by finding that termination would not do more harm than good under the particular circumstances of that case. Id. at 109–11. In so holding, it stated that while "permanency must be the Division's goal," no authority "has stated that the unlikely possibility of permanency in the future should outweigh a strong and supportive relationship with a natural parent." Id. at 110–11.

Here, in addressing prong four, the court credited Kanen's testimony that both defendants had "parenting defects" including substance abuse and cognitive issues, that were unlikely to change, and presented "a high risk of neglecting the children" in the future. It also noted Kanen's opinion that Kara would not suffer any harm if separated from defendants and that the three older girls' "grief" at losing them "could be mitigated to some degree with guidance and therapy."

In so finding, the court acknowledged that the Division's plan for all four children at the time of trial was select home adoption,[3] and that there were "no promises that [they would] remain together nor that they [would] be adopted in a timely manner." However, the court found that defendants' efforts to comply with services were "not enough to convince [it] that they will be able to care for their children in the immediate future."

Kelly, Yvette, and Narissa, who were adolescents by the time of trial, firmly expressed a desire <u>not</u> to be adopted. Kanen testified that the three would suffer "grief" at the loss of their parents, and Kelly in particular displayed mental health issues including suicidal thoughts and self-harming behavior that may well have been caused by her unstable situation and separation from her parents.

---

[3] "'Select home adoption' [is a] process that includes looking for an adoptive home in New Jersey and registering the child on the national adoption exchange." <u>E.P.</u>, 196 N.J. at 98.

A-5048-17T4

The E.P. Court cautioned against breaking a child's psychological and emotional bond to a natural parent "with nothing substituted in its place." E.P., 196 N.J. at 109 (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 611 (1986)). As of the trial date, this was the situation for the children here.

Since the court's decision was issued in June 2018, the children have been placed with their aunt, and the Division's plan for them has been changed to relative adoption. Thus, a comparative bonding evaluation is now appropriate. While we do not find the court's finding of prong four to be "wide of the mark" as of the time of the decision, in this unusual factual context, we must reverse and remand as to prong four and the portion of prong three requiring the court to consider alternatives to termination. The post-trial developments require a fresh inquiry. See T.S., 417 N.J. Super. at 250 (remanding for a prong four inquiry based on post-trial developments). On remand, the court should consider whether adoption by the aunt is feasible and likely; whether the aunt would instead prefer KLG status; and whether, under the circumstances as they now exist, termination would not do more harm than good. In reevaluating prong four, the trial court should also consider whether defendants have continued in their efforts to achieve sobriety post-trial, and whether they could safely parent the children in the foreseeable future.

We need not consider the remaining issues raised by defendants in their briefs. On remand the record will be reopened and defendants may provide a foundation to submit the evidence they argue should have been admitted previously.

Reversed and remanded for an expeditious hearing consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION