# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3591-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

R.O.,

     Defendant-Appellant,

and

G.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF O.C.,
R.A.C., and J.O.C., minors.

_____

        Submitted April 2, 2025 – Decided April 23, 2025

        Before Judges Marczyk, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0045-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Adrienne Kalosieh, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.O. (Rita), the biological mother of minor children O.C. (Owen), R.A.C. (Rose), and J.O.C. (Jack),[1] appeals from the Family Part's June 27, 2024 judgment of guardianship entered following a trial, terminating her parental rights to the children. G.C. (Greg), the biological father of the children, does not appeal the order terminating his parental rights. Having considered the arguments in light of the record and applicable legal standards, we affirm.

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

I.

Rita was born in Ghana, but is a citizen of the United States. Rita and Greg married in Ghana in 2009 and subsequently moved to the United States where they had three children: Owen, born in 2014; Rose, born in 2017; and Jack, born in 2019.

## A. Events Prior to the Guardianship Trial.

On February 28, 2020, the Old Bridge Police Department responded to a call from Rita and Greg's neighbor stating that Owen, who was five years old at the time, fell from their apartment's second-floor balcony. Owen was taken to the hospital, and police forcibly entered the home to find then-three-year-old Rose and then-one-year-old Jack locked in separate rooms with no adult present. Police contacted the Division of Child Protection and Permanency (Division), who immediately took custody of the children.[2]

During Rita's interview with the Division shortly after the incident, she indicated she left the children alone for approximately three hours while she

---

[2] All three children resided at the family's apartment under the care of defendants until the Division removed them from the home on March 2, 2020, pursuant to a Dodd removal. See N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010) ("A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82.").

A-3591-23

went shopping in Newark, Perth Amboy, and then Sayreville. She was alerted about Owen falling from the balcony by a neighbor who advised her police were at her apartment. She informed the Division she gave Owen a tablet and locked the two youngest children in their rooms. When asked why she left the children home alone, Rita responded that she did not have a car and that Greg's car had too much "stuff in it." She stated she usually leaves the children with Greg, but he was in Ghana for a three-month vacation.

Rita stated she never left the children unsupervised prior to this incident, but on this day she thought she should do all her shopping while she was out "so she would not have to leave the home" the next day. Rita also explained she locked the two youngest children in separate bedrooms because, three days before this incident, she found Owen and Rose on the balcony unsupervised after they opened the door themselves.

The Division subsequently went to the hospital where Owen was treated. He was discharged from the hospital a few days after the incident with an air cast on his foot and no significant injuries.

Rita was later arrested and pled guilty to one count of fourth-degree endangering another person, N.J.S.A. 2C:24-7.1(a)(2). She received two years' probation but was released early for good behavior. In December 2020,

following a fact-finding hearing, the Family Part found Rita had abused and neglected Owen, Rose, and Jack pursuant to N.J.S.A. 9:6-8.21(c), when she left them alone in the apartment for nearly three hours.

After executing an emergency removal, the Division placed the children in their current resource home with D.D. (Dana). Salome Gyan-Benneh, a Family Services Specialist who speaks Rita's native language, Twi, was assigned to the family's case from March 2020 through February 2023. At the time of their removal, the Division reported all three children wore diapers, were fed infant cereal inappropriate for their age, and did not have properly fitted clothing despite bags of clothes piled in their bedrooms. The court granted Rita supervised visitation three days per week.

In early March 2020, the Division contacted Greg, who stated he was aware of the situation. When the Division contacted Greg again on March 9, he indicated he did not want to speak with the Division worker and, a few days later, advised the worker to stop contacting him. He did not immediately return to the United States purportedly because of the delays caused by the COVID-19 pandemic.

The Division assessed several relatives and friends for placement, including Rita's mother in Ghana and a pastor friend of the family in Georgia.

They were all ruled out. Dana's home was the only available option that could accommodate all three siblings.

In June 2020, Rita was ordered to attend individual therapy and parenting skills training. Because of the pandemic, she was granted supervised virtual visitation until in-person visitation resumed in mid-July. Catholic Charities facilitated Rita's visitation, and the Division arranged for services with Belinda Amatekpor, a therapist from Ghana who also speaks Twi. The services for parenting skills explored "issues related to cultural differences, acculturation[,] and its impact on [Rita's] parenting," and "assisted [Rita] in processing how [Greg's] actions and or inactions appear[ed] to impact her parenting efforts."

The Division confirmed Rita attended visitation with the children, therapy, and training, and that Greg, who remained in Ghana until August, began participating in virtual visitation in July 2020, but stopped attending by the end of the month. However, Catholic Charities' visitation reports from June through August 2020 described Rita's lack of engagement and interaction with the children.

In late September 2020, the Division made a domestic violence liaison referral for Rita due to concerning statements and reports of domestic violence made by Owen. Specifically, a September 8 visitation report from the Division

6

indicated Rita used her cell phone to call Greg so that the children could talk to him. Owen took the phone and said, "Daddy you are bad, you are very bad. You have to have a time out. I want to hit you . . . . [Y]ou have to be nice to [M]ommy, will you say sorry to [M]ommy[?]" The Division worker suggested that Owen end the call after noticing he became loud and upset while speaking with Greg.

Then, on September 29, a visitation supervisor from Catholic Charities indicated "[Rita] ha[d] a hell of a bruise on her right cheek and this . . . upset" Owen, describing the injury as "swollen at the cheekbone and very discolored." Owen, upon seeing Rita's face, stated "I told Daddy not to push you, [he] used to hit me in the face too[.] . . . Daddy is very bad." Rita then spoke with Greg on the phone, during which Owen took the phone and said "you are very bad, you are mean, I told you not to hurt [M]ommy." The worker noted Owen "went on like this for several minutes" and she overheard Greg "laughing at the child" because the phone was on speaker. Greg told the worker that he did not like how Owen spoke to him and stated the worker "ha[d] to do something about that" and they would "have to talk to the resource mom about that, because that must be where he is getting that attitude from."

In November 2020, Rita saw Dr. Ada Liberant for a psychological evaluation. Rita recounted an incident that occurred in October and forced her to live in a domestic violence shelter for women. She advised Dr. Liberant that she had cooked food and left it on the stove to cool. However, Greg wanted it placed in the refrigerator before she left for work. Rita then left for work but forgot to take her keys to the apartment. When Rita returned the next morning, Greg locked her out and refused to allow Rita into the home until she obeyed him. Rita contacted Gyan-Benneh, who placed her in a domestic violence shelter. Rita told Dr. Liberant she received text messages from Greg stating he would destroy her possessions if she did not come home. She subsequently moved back into the apartment in November 2020.

Rita also recounted that when she was pregnant with their third child, Greg "beat [her] up" and slapped her because she took a slice of bread from the refrigerator. She also believed Owen saw Greg "beat [her]" and that when Greg "wants to be violent and hit [her]," Owen tried to stop him. She also disclosed that "every time [she] was pregnant and was about to have a baby, [Greg] would say he had to go to Ghana" and "[Greg] abandoned [her]" with the third child, whom she delivered "in somebody's apartment."

A-3591-23

Dr. Liberant's report stated Rita "detailed a history of coercive control in the relationship" and "present[ed] as a battered woman." She also found Rita had "some trauma resultant from . . . domestic violence" and recommended she receive domestic violence-related services. The report also stated Greg "must engage in the 26-week Batterer's Intervention Program."

The court subsequently ordered Greg to attend Batterer's Intervention. While Greg initially participated in Batterer's Intervention, he informed the program in September 2021 that he needed to take a few weeks off to handle a private matter and never responded to the program's attempts to communicate with him. Greg was discharged from the program for lack of engagement and noncompliance and has never completed the services.

In February 2021, Gyan-Benneh reported a Division worker received a brief phone call from Rita "sounding as if she w[as] in distress." Rita asked the worker "to get her help and rescue her from the home." The worker heard commotion, yelling, and arguing in the background before the call disconnected. When the worker advised Amatekpor, the therapist indicated Rita did not attend her therapy session scheduled earlier that day. Woodbridge Police subsequently went to Rita's home address, where she told the officers "there was no problem."

A-3591-23

In mid-March 2021, Rita advised the Division she contacted the domestic violence hotline and asked for assistance with housing. Rita again moved into a shelter in April following an incident where Greg locked her out of two bedrooms, causing her to sleep on the couch. Rita eventually obtained a one-bedroom apartment through Catholic Charities' Rapid Re-Housing Program in September 2021.

The court conducted six permanency hearings between February 2021 and July 2022. At each hearing, the Division proposed reunification of the children with one or both parents, and the court granted the Division's request for a three-to-six-month extension to allow the parents to continue visiting the children and receive services. Greg did not visit the children or attend the court hearings after September 24, 2021, and failed to respond to the Division's communications.

Catholic Charities supervised numerous visitations between Rita and the children throughout 2021, during which Rita sometimes lacked engagement or failed to interact with her children. On other occasions, she would have positive interactions with the children, such as playing with them at the park. However, in many instances, the visitation supervisor had to address the children's behavior and safety when Rita failed to acknowledge the issues.

A-3591-23

Between January and March 2022, Rita attended fifteen supervised visits with the children. She would bring food for the children at each visit but often lacked engagement and interaction with them, failed to set boundaries for the children, and did not address their behavior. Although Rita began engaging the children in activities over time, visitation workers had to continue correcting the children's behavior and safety.

In April 2022, the Division arranged in-home therapeutic supervised visitation once per week. Between April and June 2022, Rita attended nine supervised in-home visits and five supervised out-of-home visits. She provided food and toys for the children, played with them, initiated conversation, and showed an understanding of each child's development stage. However, the visitation supervisor often needed to intervene to correct the children's behavior and address safety issues.

During an April 2022 visitation, Owen looked through the window of Rita's new apartment and noticed Greg's vehicle in the parking lot. When Owen asked if Greg was at the home, Rita did not answer but redirected Owen's attention and played with him. Rita denied that the vehicle belonged to Greg and indicated she could not get in touch with Greg. However, in the court's June 27, 2024 written opinion, it noted Greg was not permitted to know where Rita

11

lived because she was placed in the apartment as a victim of domestic violence and found "that the car in the parking lot was [Greg]'s."

In May 2022, a visitation worker provided Rita with information on health and nutrition for children. The worker also suggested that Rita make small portions of cooked meals from her culture and offer the food to her children to accustom them with eating home-cooked meals. Rita responded the children do not like eating food from her culture and prefer pizza and hamburgers.

In September 2022, the Division held a Family Team Meeting (FTM) at Rita's residence. When a worker arrived at the apartment complex for the FTM, they noticed Greg driving his vehicle in the parking lot, looking for a place to park. The worker then observed Greg walking toward the door of Rita's apartment, speaking with her, and then leaving but never saw Greg return to his vehicle. When the worker later confronted Rita about the situation, she denied Greg's presence and became "defensive," stating she did not know how Greg got her address.

After Rita began a new job in October 2022, Amatekpor reported Rita was inconsistent with therapeutic sessions. Amatekpor noted Rita exhibited symptoms of stress and being overwhelmed in managing her reunification visits and individual sessions and that there were several cancellations and "no call/no

shows." Amatekpor stated Rita "continue[d] to exhibit a lack of understanding of the realities of coordinating her children's needs and hers" and Rita had been unable to provide a plan as to "who will watch the children at night while she works" should reunification occur.

In November 2022, the Division referred Rita to licensed psychologist Dr. Alison Strasser Winston for a psychological evaluation. Rita denied any physical abuse between her and Greg. However, she subsequently acknowledged Greg had pushed her one time and she hit her head. She also stated she no longer had any contact with Greg.

Dr. Winston's report noted Rita "demonstrated a significant tendency to minimize the concerns" about the incident where Owen fell from the balcony, "expressing the belief that she had only been gone for a relatively short period of time" and was unable to take her children with her.[3] She also found Rita further "demonstrated a significant tendency to minimize the concerns" about domestic violence in her relationship. Dr. Winston indicated Rita "demonstrated little progress" regarding "the concerns about her parenting deficits and her ability to provide . . . a safe and stable environment" for the children. She also found that even though Rita complied with the recommended services over the

---

[3] She subsequently acknowledged she had been gone for over three hours.

past two-and-a-half years, Rita posed an "unacceptable risk of harm to her children" and she could not "independently provide her children with appropriate[] care, supervision and protection."

Dr. Winston "strongly recommended that a permanent plan for the children aside from reunification with [Rita] be considered to provide the children with the permanency they desperately require and to ensure their safety and well-being for the foreseeable future." She found it was "highly improbable that [Rita] w[ould] be capable of safely parenting her children within the foreseeable future or within a time frame that will meet her children's need for permanency."

Dr. Winston further opined Rita's "prolonged involvement in an unhealthy relationship" with Greg and her "refusal to sever all ties" with him "calls into question her . . . ability to protect her children and herself from harm." She also recommended that Rita continue attending therapy and parenting education because it could "be viewed as one factor that would reduce her level of risk to her children."

Thereafter, Rita continued to engage in individual counseling and parenting skills training. She attended four supervised in-home visits with the children and four supervised out-of-home visits between October and December

2022. Rita largely exhibited the same pattern of behavior with the children as during her visits between July and September 2022.

On January 18, 2023, following a permanency hearing and compliance review, the court entered an order modifying the permanency plan to termination of parental rights (TPR) followed by adoption. The order indicated defendants were "unable to eliminate the ongoing risk of harm to the children" and that Greg had neither participated in the services nor visited the children since 2021. It also noted that although Rita participated in the services and complied with the court orders, her current evaluation determined that she remained unable to safely care for the children.

The Division filed its complaint for guardianship in February 2023. In April 2023, the court entered an order terminating the abuse and neglect matter. It also required Rita to continue individual therapy, parenting skills training, and domestic violence services. It entitled Greg to virtual supervised visitation under a schedule determined by him and the resource parent, and ordered all expert evaluations must be scheduled within sixty days of the order.

**B. The Guardianship Trial.**

The guardianship trial was conducted over ten days between December 2023 and April 2024. The Division presented testimony from Gyan-Benneh,

adoption worker Tawanna Stanley, and the children's resource parent, Dana. The Law Guardian offered testimony from nine-year-old Owen, six-year-old Rose, and four-year-old Jack. The Division and the Law Guardian also called Dr. Winston as an expert witness, who had re-evaluated Rita and conducted bonding evaluations prior to trial. Rita and Greg testified on their own behalf and offered expert testimony from psychologist Dr. Barry Katz regarding his psychological evaluation of Rita and his bonding evaluations.

### 1. The Division's Witnesses.

Gyan-Benneh testified regarding her experiences with the family as the case proceeded from March 2020 to February 2023. She testified the Division referred Rita to Amatekpor who addressed concerns raised in Rita's visitation reports regarding her parenting issues. She testified Amatekpor expressed concerns about Rita downplaying issues during her visitations when brought to her attention.

Gyan-Benneh testified that because she was familiar with the Ghanaian culture she shared resources with Dana regarding cooking Ghanaian food, YouTube videos about Ghana, and church services, despite neither Rita nor Greg requesting that their children be educated about Ghanaian culture.

<span>A-3591-23</span>

Notwithstanding three years of services including parenting skills, Gyan-Benneh reported Amatekpor expressed concerns about Rita's progress.

Gyan-Benneh recounted that Rita called her in October 2020 after Greg locked her out of the family home. She testified she and Amatekpor referred Rita to a domestic violence shelter, where Rita resided for a month before returning home against clinical advice. Gyan-Benneh also recalled an incident in April 2021, where Rita explained that Greg locked her out of the bedrooms in the apartment, which caused her to return to a domestic violence shelter for a second time. Gyan-Benneh further noted Greg never completed the Batterer's Intervention Program and never responded to her attempts to contact him from September 2021 to January 2023.

Gyan-Benneh further explained her efforts in pursuing potential placement of the children with family friends and their maternal grandmother in Ghana—all of whom were eventually ruled out. She stated she interacted with the resource parent, Dana, and never experienced or observed Dana trying to convince the children that living with her would be better than going back to defendants.

Gyan-Benneh also noted concerns about the children's eating habits, specifically malnutrition. She expressed concerns regarding her observation of

17

the children's lack of social skills and developmental delays, which were acknowledged by their pediatrician. She noted the children made improvements after being placed with Dana and receiving appropriate services.

Stanley testified the children appeared comfortable with Dana. The children advised her they enjoyed living with Dana and wanted to remain with her. She noted there was no indication from either parent that they requested the Division to provide the children with lessons about Ghana or that they be taken to any specific religion classes. She acknowledged the importance of cultural heritage but noted it was more important for the children's "basic needs [to] be[] met."

Dana testified the children have lived with her for four years since they were removed from defendants in February 2020. She noted she understood the difference between kinship legal guardianship (KLG) and adoption and wanted to adopt the children to provide them a "permanent forever home."[4] Dana testified about her positive experience as the children's resource parent, the children have become "rooted" in her family, and they have become siblings to

---

[4] Dana testified she was willing to continue a relationship between the children and Rita and Greg, provided termination did not have an adverse impact on the children's mental health.

her children.  On cross-examination, she testified she never tried to convince the children that they would be better off living with her than with their parents.

Dana also noted her various efforts to preserve the children's culture and African heritage.  She stated that when the children were initially placed in her care, she asked defendants if she should learn about any cultural foods, customs, or routines, but never received a response.  Dana testified she contacted Gyan-Benneh for Ghanaian food recipes and then made the children dishes from the recipes.  She indicated she never taught the children Twi because they did not speak the language when they were placed with her, and defendants did not teach them the language.  Dana testified defendants never told her about the children's religion, but she began reading the children Bible verses after the Division informed her they were Christian.

Dr. Winston testified regarding her psychological and bonding evaluations and discussed her extensive experience in evaluating children and parents in abuse and neglect cases.  Dr. Winston stated Rita "completely minimized the allegations of domestic violence" when asked about her relationship with Greg, which Dr. Winston said contradicted Rita's extensive disclosures to Dr. Liberant.  She further stated that when she asked Rita about arriving at a visit with a bruise on her face, Rita denied having a bruise and said

the children had not witnessed "any real physical violence between" her and Greg. Instead, Rita stated she and Greg "engag[ed] in play fighting." She expressed concerns about Rita's plans to raise the children with Greg, particularly in light of his failure to attend the Batterer's Intervention Program. She noted the domestic violence was not just physical, but she characterized it as "intimate partner violence," which involves a "pattern of coercive and controlling behavior where one partner is . . . dominan[t] over the other and exerts control."

Dr. Winston also testified regarding her bonding evaluation of Rita and the children. She found Rita's interactions with the children primarily focused on the food she brought to the visits and subsequent cleanups, which was consistent with the visitation reports she reviewed. She noted that although the children were happy to see Rita and appeared comfortable around her, they did not initiate any physical affection or spontaneously talk to her, and Rita did not ask them what they had been doing. Dr. Winston concluded the children have

an "insecure emotional attachment" with Rita, meaning the children do not look to Rita to meet their needs.[5]

Dr. Winston described a "very different" bond between the children and Dana. The children referred to Dana as "auntie" and, on one occasion, Rose called her "momma." Dr. Winston stated Dana engaged the children in play and learning activities, and they expressed they wanted to stay with Dana. Dr. Winston concluded the children view Dana "as their psychological parent even though she's not their biological parent" and regularly look to Dana "to meet their emotional, medical, physical, [and] educational needs."

Dr. Winston testified the termination of Rita's parental rights would be in the children's best interest and would not cause them serious and enduring harm. She noted Rita poses an unacceptable risk of harm to the children despite receiving services for several years. She found "a big part of the risk" was Rita's failure to acknowledge her "unhealthy relationship" with Greg and unwillingness "to end that relationship in order to improve her chances of being reunified with her children." Dr. Winston further stated:

---

[5] Dr. Winston had the same conclusion about Greg, noting the children did not view him as a consistent provider, given that he had not seen the children in almost two years.

21

> I have serious concerns about the level of emotional, physical, financial, psychological, [and] verbal abuse between this couple and the fact that they are both planning to parent together is extremely concerning and raises serious red flags about the level of risk that these children would be at if they were returned to that type of a home.

Dr. Winston noted another risk was Rita's lack of knowledge concerning the children's needs, her poor organizational skills, difficulty interacting with the children, and her failure to redirect and plan for them. She found Rita would not eliminate these risks in the foreseeable future or benefit from additional time working with her service providers because she "demonstrated very little improvement" after receiving services for almost four years. She noted she was "struck" by "how many extensions of permanency the family was given." She believed granting an extension of the permanency plan would cause the children further psychological harm because they need stability rather than more uncertainty.

Dr. Winston acknowledged that adoption would have some impact on the children because Dana is not from Ghana and that maintaining their cultural background would be important. However, she concluded Dana is "a lot more capable of providing for their needs" and that parental termination would be in the children's best interest, without causing them serious emotional harm. In

22

short, Dana was more capable of providing a safe and stable environment for the children than defendants.

## 2. Law Guardian's Witnesses.

All three children provided testimony about their lives since February 2020. They testified they felt safe and happy living with Dana. Owen stated "she does many nice things." Owen testified he does not have good memories of living with defendants. He testified he lived with Dana since he was five years old and stopped living with Rita because "[he] fell off of a big building." He testified he is happy he no longer lives with his parents because they left him and his siblings home alone. Owen understood he may never see his parents again if Dana adopted him, but stated this did not bother him. He noted that no one has spoken negatively about his parents, but he does not want to live with them. Rather, he wants to live with Dana, and it does not matter that she is not from Ghana.

The children testified they did not participate in special African activities with Dana and that she does not prepare African foods. Notably, Jack stated he does not know what Africa is. Similarly, Rose did not understand the meaning of the word "culture" when asked if she does anything involving African culture,

23

stated Africa was "a different kind of state," and did not know where Ghana is located.

The children also indicated Dana takes them to church, and Rose and Owen testified they go to Sunday school, which Owen said he enjoys. The children stated they all pray together at bedtime. Moreover, the children understood Rita speaks a different language, but they did not know its name, could not speak any words, and did not understand what Rita says. Rose stated she would like to learn Rita's language, but Jack and Owen testified they did not want to learn it.

Jack, who was one year old when removed from defendants' home, testified he remembers living with Rita but could not recall what he remembered about it. He stated he does not remember living with Greg and does not know why he stopped living with his parents. Jack said he does not think about living with Rita and Greg and would not like to go back to living with them. When asked where he wanted to live, Jack responded Dana but subsequently stated, "[i]t's too hard to pick." He also stated he would not like it if he never saw his parents again.

Rose, who was three years old when removed from defendants' home, remembered living with Rita but did not remember Greg's presence. She

testified she stopped living with Rita because Rita went to jail when Owen was in the hospital. Rose testified she does not want to think about living with her parents and does not want to live with them. She stated she wants to become part of Dana's family. She understood she may never see or live with her parents again if Dana adopts her and stated she would be okay with that.

## 3. Defendants' Witnesses.

Rita testified she tried to involve the children in African culture by exposing them to African foods, religion, television, language, and music. She also sent them to Sunday school at their church where many of the congregants were from Ghana.

Rita testified she and Greg have a good marriage but "sometimes" have "little arguments." However, on cross-examination, Rita admitted she told Dr. Liberant that she and Greg did not have a good marriage and that their relationship became worse after having children. On direct examination, she recalled an incident when "there was [a] little argument and [Greg] pushed [her], and [she] hit the wall with [her] head." Rita denied Greg slapped her or engaged in any other physical violence against her but admitted on cross-examination that she told Dr. Liberant Greg slapped her for taking a slice of bread. She also indicated if Greg calls her names, she does not "take it as . . . abuse" because

"it's . . . a normal issue that happens in marriage" in Ghana. She further noted Greg would sometimes make her walk home from work when he got upset.

Rita acknowledged Greg locked her out of the apartment. She stated that after receiving advice from her case worker, she was placed in a domestic violence shelter and lived there "for some time." She testified Greg stopped providing her with financial support after she left the family residence in 2021. She stated Greg became "upset" whenever she got pregnant and left her alone with the children for up to three months at a time when he went to Ghana.

Regarding the February 28, 2020 incident, Rita agreed she made "a very big mistake" leaving the children home alone while she went to the store to purchase food for them. She explained she did not take Rose and Jack with her because they were asleep, and she gave Owen a tablet and told him to occupy himself. Rita also stated:

> when I got downstairs, I came back to the apartment because I had forgotten something. So, when [Owen] saw me he said, "I'm scared." I asked him why. I said, [l]ook, I told you I was going to buy something . . . and I said I have forgotten something [so] I came back to fetch it.

She also testified she did not take the children with her because the car she was using had several items in it, and she did not have room for the children. When asked why she did not go to a store closer to the home, she responded "my

mistake was that I should have just bought one or two boxes in the area[] [near] the neighborhood . . . waited until the [neighbor] was home and then le[ft] the kids with him so I could go further."  Rita initially testified she expected to be gone for thirty minutes, even though the store was about twenty-five minutes away, and subsequently stated she expected to be away for no more than hour. She also admitted that prior to the February 28 incident, she awoke from a nap and saw Owen and Rose approaching the balcony.  She told Owen never to go near there because he could fall.

Regarding the incident where the Division worker saw Greg at Rita's apartment, she testified she did not know Greg was coming to her home or why he went there.  However, on cross-examination, she testified she spends every day at Greg's home.  When asked why the children testified about wanting to stay with Dana, Rita claimed Dana "poisoned the kids' mind[s]" and "said so many things to them" about her.  She further stated she visited the children after they testified at trial, began questioning them about their statements, and told them that she heard their testimony.  She indicated Greg had not visited the children for two years because at times he was visiting his sick mother for a period of time in Ghana.

27

Rita testified that prior to the trial she planned on reuniting with her children and represented to the Division she did not have a relationship with Greg. She noted, however, that her plan had changed and she wanted to reunite with Greg and raise the children together after working out a plan with their families in Ghana. She was told to go back to Greg "because everything was [going to be] okay."

Greg acknowledged he did not complete Batterer's Intervention. When asked why he did not complete the program, he explained "they stopped texting me the link for me to get back on because I left without letting them know that [I went] back to Ghana to care for my mom." He did not attempt to visit the children for two years because he did not want to work with Gyan-Benneh, whom he called a liar and wicked. He denied knowing he needed to take further action to get the children back in his care because "[he] thought . . . as long as [Rita was] . . . going to visit the kids and stuff like that, you know, she can do it." He testified that if Rita reported instances of domestic violence to her counselor, "that[ was] a lie because . . . there's arguments, we can argue. But that's not violence -- arguments between a couple." He admitted that he pushed Rita but "to [him] it[ was] not domestic violence . . . [where he was] sitting down watching TV . . . and she came . . . in front of [him] . . . and [he] just push[ed]

her away." He acknowledged Owen observed him pushing Rita. He also admitted he locked Rita out of the house, which required her to go to a domestic violence shelter, because she did not "obey" his instructions regarding food preparation and storage.

Dr. Katz testified Rita has a below average IQ, which shows some "limitations," but she demonstrated "adaptive independent functioning," as evidenced by her obtaining a driver's license and working a standard job.[6] He also concluded Rita has difficulty handling stressful situations, resulting in "poor judgment" and "lack of clear reasoning." Dr. Katz initially testified the isolation of the COVID-19 pandemic and parenting alone contributed to Rita's poor decision making, leading to the children being left home alone, but conceded upon review of the timeline that the incident occurred before the COVID-19 lockdown.

Regarding the alleged domestic violence, Dr. Katz found only one documented report of violence to which Greg and Rita admitted—the incident where Greg pushed her. He asserted it was an "instance of episodic violence," not an ongoing pattern of violence. Dr. Katz asserted the family has "dynamics

---

[6] Dr. Katz also found Greg had limitations "in terms of child[hood] development," which he attributed to his Ghanaian culture, where men were usually not directly involved in childrearing.

of a patriarchal . . . family, based upon values of culture from [Ghana]" and that Greg's actions should be viewed through the lens of his cultural context. He acknowledged that if children are exposed to domestic violence, it can cause anxiety, trauma and "a number of unfavorable and ill-advised outcomes."

When asked if Greg's alleged abusive conduct, including when he locked Rita out of the home, constituted coercive control, Dr. Katz responded "[t]hat's a gray area." He claimed Rita should be protected if she voluntarily and willingly agreed to live by this culture, and the State should not intervene. He cautioned that "we have to make the differentiation, very clearly, between what's patriarchal and accepted and what's actual abuse or coercive control." Dr. Katz also did not find Rita's statements to Dr. Liberant reliable because there were no follow-up questions after Rita said Greg beat her up.

Dr. Katz opined that both defendants had a bond with the children. He acknowledged the children "showed a bond and attachment" with Dana and she was viewed "as a nurturing figure, . . . a parental figure, interacting, loving, [and] caring," in much the same way as with Rita and Greg. However, he noted the issue was not who was the better parent, but whether Rita and Greg could provide minimally adequate parenting.

A-3591-23

Dr. Katz stated Dana could influence the children by believing "the biological parents [are] a threat to the children," "[e]ven if she didn't verbally say it." He acknowledged "there was nothing explicit stated" and "nothing to show that the resource parent was saying . . . [Rita and Greg] are evil or anything like that." However, he did not have confidence in Dana following through on her commitment to keep the children in contact with Rita.

Dr. Katz further opined that because the children are black, they can go through a "culture shock" as they get older when they "understand that they're being perceived not as white, Irish, middle class kids, but as black children . . . facing prejudice and biases." He commented that Dana, "as good-willed as she is, would not be equipped to handle those types of issues that the biological parents would be able to handle, because they are [from] the same culture." He noted the alternative of a child being raised by a family of a different race "should only be considered if there are no other alternatives to [TPR]." He acknowledged, however, "[i]t's better than the children not having permanency. Much better."

Dr. Katz concluded TPR "would do more harm than good" because the children would be deprived of their culture and family, and he believed the children should be raised by their biological parents. He testified the children

were denied their culture and that Rita, not the State, should decide whether she wants to parent with or without Greg. He stated that if she co-parents with Greg, he will need to complete Batterer's Intervention, which "should not contradict accepted practices within [his] culture if they're not identified as being abusive to the culture itself or to our general culture."

Dr. Katz acknowledged Rita was incapable of parenting the children at the time of trial and recommended "a slower [reunification] process where the children get to acclimate to the change rather than being abrupt." He explained he would want to see a "melding" back together, but that Rita would need to have supervised visitation by individuals approved by the Division who would also help mentor Rita in appropriate parenting, and that Rita should continue her therapy. He acknowledged this delay in permanency would last for six to twelve additional months.

## C.  The Family Part's Order and Opinion.

In assessing the credibility of the witnesses, the trial court found both Gyan-Benneh and Stanley "very credible" witnesses. It likewise found Dana "very credible." The court found Owen credible and noted Jack had difficulty focusing during his testimony, but neither appeared to have been coached in

32

giving answers. It found Dr. Winston to be "a very knowledgeable and credible witness."

Regarding the defense witnesses, the court "overall did not find [Rita] to be a very credible witness, although [it found her] more credible than [Greg]." It stated, Rita's "attempts to defend [Greg] resulted in her contradicting documented facts, and her credibility was damaged by her questioning the children about their testimony . . . after they testified."

The court also concluded Greg "was not a credible witness, primarily because his responses related to the key issues in this case were either attempts to avoid responsibility or were implausible." The court also found he was "intentionally deceptive" with some answers. Additionally, the court found it "troubling that in several instances where [Greg] appeared to be telling the truth, he was unable to understand why his actions were inappropriate."

The court found Dr. Katz was "very well qualified" and a "credible witness." However, "the [c]ourt found some of his conclusions perplexing." It further found Dr. Katz dismissed concerns of domestic violence between Rita and Greg and the concept of coercive control applying to their relationship.

The trial court entered an order and issued a comprehensive, well-reasoned, 107-page written opinion on June 27, 2024, as discussed more fully

33

below, terminating Rita's and Greg's parental rights to their children. It found, by clear and convincing evidence, the Division proved all four prongs of the best-interests-of-the-child test, N.J.S.A. 30:4C-15.1.

## II.

Rita argues the trial court erred in holding prongs one and two were met because the Division failed to provide evidence that culturally based gender norms perceived as marital discord would endanger the children. She asserts the Division failed to prove the parents' adherence to male dominance in interpersonal relations endangered the children. She further argues the trial court erred in holding prongs one, two, and four were met because Rita would continue to need parenting skills and ultimately transitional services prior to reunification. Rita claims there was no set measure for when she would have achieved sufficient parenting skills to reunify, and the initial harm caused by the lack of supervision was cured.

Rita further contends a tempered reunification process would not delay permanency but would be the effectuation of the reunification plan required by the improper severance from the children's family of origin. She also asserts the trial court erred in concluding that prong four was met to terminate parental rights when Rita met the minimal parenting requirements.

A.

An appellate court's review of a decision "to terminate parental rights is limited." N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 468 (App. Div. 2017). This court affords substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case,'" N.J. Div. of Child Prot. & Perm. v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). An appellate court will not reverse a termination decision when it is supported by "substantial credible evidence in the record." C.J.R., 452 N.J. Super. at 468. "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

The termination of parents' rights to raise their children is a matter of constitutional magnitude. In re Guardianship of K.H.O., 161 N.J. 337, 346

(1999). "Severing the ties between a child and a parent is . . . a weapon of last resort in the arsenal of state power." F.M., 211 N.J. at 447. As this court articulated, "after the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights." In re Adoption of a Child by J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015).

A parent's right to raise their children, however, is "not absolute" but limited "by the State's parens patriae responsibility to protect children." F.M., 211 N.J. at 447. Because termination permanently severs the legal relationship between parent and child, it should be ordered only where "proof of parental unfitness is clear." Ibid. The burden is on the State to satisfy, by clear and convincing evidence, four factors outlined under the best-interests-of-the-child test:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to [TPR]; and

(4) [TPR] will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These "four criteria are not discr[ete] and separate, but overlap with each other . . . to identify a child's best interests." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001). The State must demonstrate that a parent "has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "[A]ll doubts must be resolved against [TPR]." K.H.O., 161 N.J. at 347. The court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).

B.

We first address whether the court properly determined the Division established prongs one and two pursuant to N.J.S.A. 30:4C-15.1(a). Rita argues the court failed to distinguish between inadequate parenting by not measuring up to "social and economic norms" from that injurious to children. Noting her African origin and intent to raise the children in their cultural norms, Rita claims the children suffered no harm "other than" being "bystanders" to a traditional

African marriage. She claims the Division "failed to show [her] putting up with toxic masculinity . . . caused or threatened serious emotional injury or developmental retardation to the children."

Rita further asserts she felt "unscathed by [Greg]'s treatment of her" and she did not feel afraid or suppressed by him or see the need to remove him from her life. She avers the court failed to address Dr. Katz's testimony that the references to abuse in the record were "ephemeral, devoid of data or exploration," and unscientific. She describes Dr. Winston's testimony as biased against the family's Ghanaian culture, amounting to "no more than junk science based on the presumption that raising a child in a traditionally African household is inherently inferior." She asserts the expert evidence was in equipoise regarding whether she allowed herself to be abused and whether her children were exposed to it.

Moreover, Rita argues the court erred in relying on New Jersey Division of Youth & Family Services v. I.H.C., 415 N.J. Super. 551, 564 (App. Div. 2010), rather than the record, to conclude she was involved in a pattern of coercive control. Rita also distinguishes the court's reliance on New Jersey Division of Youth & Family Services v. M.M., 189 N.J. 261, 279 (2007), because, unlike that case, the Division here provided no evidence of harm to the

children, given the parents lived separately, "had to hide that they saw each other," did not use drugs, and did not physically harm the children.

Finally, Rita argues the court erred in finding the children would be endangered by her lack of parenting skills. She asserts she never received a measurement defining sufficient parenting, even though she consistently attended the services, and the court's holding that the children would be endangered is "unsupported." She further claims "the court's recollection of one translated sentence"—that she would have made a shorter trip the day Owen fell—conflicts with her "clear regret" about the incident. She also asserts a gradual reunification process will not delay permanency or cause the children additional harm.

Prongs one and two "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999). Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The court's focus "should be upon harm for which there is 'unambiguous and universal social condemnation.'" N.J. Div. of

Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604 (1986) (quoting Developments in the Law: The Constitution and the Family, 93 Harv. L. Rev. 1156, 1319 (1980)). The focus is not on a single or isolated harm but rather on the cumulative "effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. Where there is a clear record showing a pattern of negative behavior or neglect, the courts need not wait to act until a child is irreparably impaired by the parental relationship. D.M.H., 161 N.J. at 383; N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 615 (App. Div. 2007).

Prong two relates to parental unfitness. K.H.O., 161 N.J. at 352. It requires the Division to demonstrate that a parent is unable or unwilling to correct the circumstances that led to the agency's involvement or that he or she cannot provide a safe and stable home for his or her child, thus delaying permanency. Id. at 348-49. The inquiry "centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing id. at 352). This prong "may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, [and] the withholding of parental attention and care." K.H.O., 161 N.J. at 353. "The determinative issue

is whether the circumstances surrounding the parental relationship, including any relationships with [others], cause harm to the child." M.M., 189 N.J. at 289.

### 1. The First Prong.

Under the first prong, the trial court found defendants' relationship with the children "unquestionably caused harm to, and would continue to endanger" them. The court stated Rita caused harm to the children by leaving them alone in the apartment for hours, which led to Owen falling from the balcony, and by continuing her relationship with Greg. It referenced its previous findings at the fact-finding hearing that Rita had neglected the children. Moreover, the court referenced that Rita later pled guilty to child endangerment in criminal court. It found the February 28, 2020 incident "revealed serious issues in the . . . marriage that went well beyond the act of [Rita] leaving three very young children" unattended, which was further addressed under prong two.

### 2. The Second Prong.

Under the first part of the second prong, the court found Rita was unwilling and unable to eliminate the harm that the children faced. It noted there was evidence of neglect before Owen's injury. The court referenced the fact that Owen and Rose were still in diapers, despite being five and three years old when the Division took custody of them, and the apartment was in chaos with the

41

children's clothes in garbage bags, the wrong sizes, and not appropriate for winter.

The court stated both parents denied domestic violence in the home, except for the incident where Greg pushed Rita and she struck her head. It noted, however, that Rita admitted Greg slapped her for eating a slice of bread and found that Owen's anger upon seeing his mother's bruised face was evidence these were not isolated events. The court noted "the domestic violence element [Greg] brings into the home obviously represents a harm to the children that [he] . . . failed to remediate," and he has not completed the Batterer's Intervention Program in the "four years" since it was ordered.

The court also found the "evidence presented at trial [was] replete with coercive control conduct by [Greg] that was intended to demean, degrade, and humiliate" Rita. It highlighted the following incidents:

> (1) [Greg's] anger at each pregnancy; (2) him forcing [Rita] to work so that she "could learn the value of a dollar"; (3) forcing her to walk home from work when he was upset with her; (4) forcing her into a domestic violence shelter after he refused to let her in the house until she obeyed him after she forgot her keys; (5) texting threats to her regarding her possessions while she was in the shelter in order to try to force her to come home; (6) locking her out of the bedrooms in the apartment, resulting in a six-month stay in a domestic violence shelter; (7) refusing to let her use his extra car to visit the children; (8) directing insults at her on a

42

regular basis, which [Rita] apparently has grown to believe is simply a part of marriage; and (9) [Rita] agreeing on the final day of the trial that she would like it if [Greg] took custody of the children and she was excluded from the household, despite the fact that that represented a complete reversal of her previous testimony that she either wanted custody or she would raise the children with [Greg].

The court stated, "[w]hether because of pressure from her family in Ghana or actual devotion, [Rita] keeps returning to [Greg]. [Rita] can choose to live in that abusive relationship, but this [c]ourt cannot permit her to choose that life" for the children.

Moreover, the court was not convinced Rita fully understood the danger in which she placed her children when she left them alone in the apartment. It determined her testimony at trial that she should have only bought a few boxes and then returned to the apartment indicated she believed leaving a five-year-old, three-year-old, and one-year-old home alone would be acceptable if she was only away for a shorter period of time. Importantly, the court also relied on Dr. Winston's testimony that Rita was "simply unable to parent" the children on her own.

As to the second part of prong two, the court determined both defendants failed to provide a safe and stable home and that delay in placement will cause additional harm to the children. As such, the court rejected Dr. Katz's suggestion

43

that Rita be given another six-month to a year extension to work on her parenting issues because the children "have been denied permanency long enough" and accepting Dr. Katz's argument would "increase the children's time in placement to over five years." The court indicated Rita failed to present evidence of a plan for reunification and both parents failed to address their "various issues" over several years while their children were in out-of-home placement. Accordingly, the court could not countenance "further delay in placement for the children."

We affirm the court's findings on prongs one and two substantially for the reasons set forth in the trial court's thoughtful and carefully reasoned decision. We add the following.

The record amply supports the court's conclusion that the Division proved the first two prongs by clear and convincing evidence. Initially, we note, the children were not merely "bystanders" in this case as suggested by Rita. She left the children—who at the time were one, three, and five years old—alone in the apartment for several hours when Owen fell from the second-floor balcony injuring himself, while the other children were locked in their rooms.

Additionally, Rita's testimony about the incident failed to demonstrate an understanding of the danger posed to the children. Although Rita admitted she made a "very big mistake" leaving the children alone for an extended period of

time, she also testified "[her] mistake was" not shopping closer to home, not that she left the children unsupervised in the first instance. The trial court found she essentially believed leaving three children—all under the age of six at the time—alone and unsupervised would be acceptable if she did not go too far for too long. While she may indeed regret the incident leading to Owen's injury, Rita's testimony demonstrates her inability to comprehend the severe risk of danger she posed to her children.

Moreover, Rita's ongoing relationship with Greg places the children's health, welfare, and safety at risk and does not provide them with a stable home. Notably, Greg admitted to one incident where he pushed Rita, causing her head to hit the wall. However, Rita also admitted Greg slapped her, while pregnant, for taking a slice of bread. Greg also locked Rita out of the house on one occasion and subsequently locked her out of the bedrooms resulting in two extended stays in domestic violence shelters. Importantly, Greg never completed the required Batterer's Intervention Program.

Contrary to Rita's assertion, the court properly relied on I.H.C. in finding the evidence presented at trial is indicative of Greg's coercive control conduct impacting her ability to care for the children. Like in I.H.C., the court here discussed the expert testimony and reports regarding the domestic violence and

45

coercive control Greg exercised over Rita. Dr. Winston stated Rita tended to minimize her concerns about any domestic violence between her and Greg despite her prior disclosures of significant domestic violence.

On the other hand, the court found some of Dr. Katz's conclusions perplexing. The court stated Dr. Katz dismissed concerns of domestic violence because he only found one documented instance of domestic violence notwithstanding the evidence of numerous other incidents. The court further indicated Dr. Katz believed Greg's actions should be viewed in the context of the patriarchal culture of Ghana, under which Rita voluntarily chose to live. However, the court found the record was replete with evidence of Greg's abusive and coercive control conduct toward Rita. For example, the court noted Greg's anger at each pregnancy; Rita residing in a domestic violence shelter on two occasions after being locked out of the apartment and the bedrooms in her home; and Greg texting threats to Rita that he would throw away her belongings if she did not come home from the shelter. Thus, as the court appropriately stated, Rita can choose to continue her relationship with Greg according to the proposed norms of Ghanaian culture, but the children should not be subjected to a life that our courts consider harmful and unstable.

A-3591-23

The court's decision was not based on a preference of one culture over another but rather on the children's exposure to the abuse suffered by Rita and the lack of improvement in Rita's parenting skills. That is, the court's decision was not—contrary to Rita's argument—based "merely" on inadequate parenting "not measuring up to social and economic norms." Rather, its decision was rooted in addressing the real harm to which Rita exposed the children, and her inability to remedy or eliminate that harm due to her inability to provide a safe and stable home for the children. Thus, after years of providing Rita with a therapist who understands Ghanaian culture and multiple opportunities to correct these issues, the court deemed permanency was in the children's best interest.

Indeed, Dr. Winston and Dr. Katz both expressed concerns regarding Rita's parental fitness. Dr. Winston found Rita demonstrated little progress with her parenting deficits and ability to care for the children after receiving services for almost three years. Dr. Katz indicated Rita's intellectual abilities and difficulty in dealing with stressful situations led to poor decision-making. Similarly, Rita's visitation reports corroborated the experts' findings because repeated concerns were raised about her judgment and inability to address the children's behavior and safety.

A-3591-23

Notwithstanding the exhaustive services being provided to Rita, she has been unable to parent independently as the children remained in a resource home for four years and she has demonstrated difficulty in dealing with stress, managing complex situations, and understanding the needs of her children. The court carefully extended the permanency plan five times prior to approving a plan of termination. Accordingly, given the children had been in placement for over fifty-one months at the time of the June 27, 2024 judgment, there was sufficient evidence in the record to support the court's decision to reject granting another six-to-twelve-month extension that it found would likely not resolve Rita's parenting deficits. "A parent's withdrawal of [their] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of [a] child," D.M.H., 161 N.J. at 379, and "[a] delay caused by [a parent's] failure to assume a responsible parental role in securing [a] permanent placement" of the child constitutes harm, K.H.O., 161 N.J. at 354. "Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

There was abundant evidence for the trial court to conclude Rita was unable to eliminate the harm the children faced and to alleviate the barriers to reunification. We discern no basis to second-guess the court's credibility findings or its conclusions that the Division proved prongs one and two by clear and convincing evidence.

C.

We next address whether the court abused its discretion in finding the Division satisfied prong four of N.J.S.A. 30:4C-15.1(a).[7] Rita contends the court erred in concluding the children's resource parent would provide a "better" home for the children because Rita believes she meets the minimal requirements of parenting. She avers the court improperly considered the bond between Dana and the children as the basis for terminating her parental rights where the

---

[7] Although Rita does not challenge the third prong, we note the court found the Division made reasonable efforts to assist Rita. Noting the Division's sensitivity to Rita's native language, the court observed the Division assigned Gyan-Benneh as the caseworker and arranged Rita's counseling and parenting sessions with Amatekpor, both of whom were from Ghana and spoke Twi. The court observed the Division attempted to preserve Rita's relationship with her children by arranging supervised visitation three times per week. Moreover, it found the Division explored alternatives to termination, including placing the children with relatives in Ghana and family friends, but none of the efforts were successful. It further stated the Division appropriately explored KLG as an option for Dana but she ultimately rejected it.

family's separation was "unjustly maintained." Citing to Dr. Katz's testimony, she further claims Dana "vilified" her. She also asserts that severing the children's ties to their family and culture could be disastrous for their identity and that Dana has no intention to learn or maintain the children's connection to African heritage and is "[b]lind to the erasure that has already occurred."

Prong four addresses whether termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Our Court has recognized the inherent risk stemming from severance of a children's ties to their natural parent. K.H.O., 161 N.J. at 355. As such, the K.H.O. Court articulated:

> the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents.
>
> [Ibid.]

Indeed, this prong requires an inquiry "into the child's relationship both with her biological parents and her foster parents." Ibid. Courts must also consider "the paramount need . . . children have for permanent and defined parent-child relationships." J.C., 129 N.J. at 26. The State should offer

testimony of an expert who has made "a comprehensive, objective, and informed evaluation" of the child's relationships.  Id. at 19.

Termination should not ordinarily be granted when there is no adequate plan for the child's permanent placement.  In re Guardianship of A.A.M., 268 N.J. Super. 533, 546 (App. Div. 1993).  By contrast, termination is appropriate when it "will result, among other things, in a permanent resolution of the child's status."  A.W., 103 N.J. at 610.  "Although the continuation of a child's cultural and religious traditions may be laudatory, it cannot guide a decision to remove or not to remove; to terminate or not to terminate; or to pass over an otherwise suitable foster placement."  F.H., 389 N.J. Super. at 627.

The courts have held that TPR "'likely will not do more harm than good' where the child has bonded with the resource parents in a nurturing and safe home."  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 492 (App. Div. 2012) (quoting E.P., 196 N.J. at 108).  This is because "a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered."  F.M., 211 N.J. at 453.

The Division, therefore, may establish prong four by presenting clear and convincing evidence "that separating the child from his or her foster parents

would cause serious and enduring emotional or psychological harm." J.C., 129 N.J. at 19; see also, e.g., M.M., 189 N.J. at 287 (prong four finding upheld where expert testimony showed that severing child's tie to foster parents would cause traumatic harm, expose him to the instability of his parents' home, and disrupt permanency in his life); D.M.H., 161 N.J. at 384-85 (prong four finding upheld where expert testimony showed that breaking child's bond with foster family would do "substantial and enduring harm," while termination would do relatively less harm).  However, because the biological parent's rights are significant, termination cannot be based entirely on the child's strong bond with his foster parents without a concomitant finding of parental fault, even if the child will be greatly harmed by the bond's severance. N.J. Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 74-75 (App. Div. 2010).

A court must also consider "the child's age [and] overall health and development, and the realistic likelihood that the [biological] parent will be capable of caring for the child in the near future."  K.H.O., 161 N.J. at 357. Although there is a "natural tendency to want to continue working with parents," the Court has cautioned that courts "must not lose sight of time from the perspective of the child's needs." Ibid.  "The child's need for permanency and stability" is the "central factor." Ibid.  Thus, "[t]he harm to children that results

from a delay in achieving permanency and stability requires that limits be placed on the amount of time granted a parent to correct her unfitness in anticipation of possible future reunification with her children." S.F., 392 N.J. Super. at 214.

Here, the trial court, in analyzing the fourth prong, noted it could "reach no other conclusion than that removing these children from their current resource home would be catastrophic to them." It declined to continue denying the children a permanent home with Dana "on a forlorn hope their parents will finally be able to safely parent them." The court noted Owen and Rose "emphatically testified they want to stay" with Dana. The court found it significant that Owen was the "most adamant" about not wanting to return to his parents because he was five years old during the removal and the most likely to remember living with his parents.

In contrast, the court found the termination of Rita's parental rights would have "little tangible impact on the children." The court observed Owen and Rose did not want to live with their parents and that Jack was "ambivalent about the issue" but initially testified he wanted to live with Dana. Additionally, the court was unpersuaded by defendants' argument that termination would deprive them of the right to raise the children in Ghanaian culture and Christian denomination because the parents never advised Dana or the Division of the importance of

exposing the children to their Ghanaian background or religion and the parents' testimony on this issue conflicted. Further, the court stated that Gyan-Benneh, who speaks Twi, never heard the children speak the language.

The court recognized the importance of cultural and religious customs, but noted that these concerns, alone, could not guide its decision in placing the children in an appropriate home. The court was mindful of Dr. Katz's concerns that the children are not the same race and cultural background as Dana, but because defendants cannot properly parent the children, "adoption by [Dana] would be the proper result." The court concluded the children "are entitled to the peace of mind of knowing they will remain in the home where they have felt safe and secure for over four years."

We conclude the record contains sufficient evidence to support the court's findings. The record buttresses the court's conclusion that termination of Rita's parental rights would not have a significant impact on the children. The court was persuaded by Dr. Winston's "credible" testimony that the children had an insecure emotional bond with Rita. As permitted by New Jersey Division of Child Protection & Permanency v. D.C.A., the court considered, under the fourth prong, the bond between Dana and the children. 256 N.J. 4, 28 (2023). The court found their bond was strong and secure. Similarly, Dr. Winston found the

children view Dana as their psychological parent and depend on her to meet their needs.

As discussed, the court properly considered and weighed the children's respective bonds with Rita and Dana based on the evidence presented at trial. The record amply supports the court's decision that the children would suffer little harm from termination of Rita's parental rights, while removing them from Dana's home would be damaging to them. The court relied on Dr. Winston, who concluded the barriers to reunification would not be alleviated in the foreseeable future. Moreover, the court noted that Dana, fully aware of the KLG alternative, wished to adopt, thereby providing a permanency plan of adoption in the children's best interest and allowing them to remain together in the same house.

The court appropriately declined to continue denying the children a permanent home. While visitation reports indicate Rita, at times, positively engaged and interacted with the children, she continued to struggle with addressing and correcting their behavior and safety and often ignored the visitation supervisor's suggestions. Notably, Dr. Winston concluded Rita demonstrated little progress after receiving parent-related services for almost three years. The court noted Owen and Rose "emphatically testified" about their desire to continue living with Dana, which, according to the court, is the only

A-3591-23

home Jack knows. In short, there was substantial evidence to support the court's decision as to the fourth prong and we discern no basis to disturb the court's findings.

Finally, to the extent we have not otherwise addressed any of Rita's other arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-3591-23